172 So. 412

**STATE v. GILL.**

No. 34140.

Jan. 4, 1937.

Rehearing Denied Feb. 1, 1937.

W. H. Mecom, of Columbia, and D. Ross Banister and J. H. Dormon, both of Monroe (Henry D. Montgomery, of Monroe, on the brief), for appellant.

Gaston L. Porterie, Atty. Gen., James O'Connor, Asst. Atty. Gen., Harry Fuller, Dist. Atty., of Winnfield, and Vinson M. Mouser, Asst. Dist. Atty., of Columbia, for the State.

FOURNET, Justice.

The defendant was tried, convicted, and sentenced on an indictment on three counts for the murder of H-Rell Hamilton, Laura Gill, and Roseann Gill, and from the conviction and sentence to hang, he has appealed.

The defendant, William Gill, who is of the Negro Race, drowned his thirteen year old stepdaughter, H-Rell Hamilton, issue of his wife's first marriage, in order to keep her from telling that he was responsible for her pregnant condition as a result of his relations with her. His two small daughters, Laura Gill, two years old, and Roseann Gill, three years old, were standing on the bank of the slough in which he drowned his stepdaughter, and in order to make what he thought would be the concealment of his crime complete, he drowned them too because they had seen what had happened. This took place on

August 6, 1936, and on the same day, while he was being questioned by the sheriff of Caldwell parish, wherein the crime was committed, the defendant admitted that he had drowned the three children and made a confession, giving in detail the commission of the crimes and his reasons therefor, which was written by the court reporter and signed by the defendant in the presence of the assistant district attorney, the sheriff, a deputy sheriff, and eight persons, three of whom were of the Negro Race. The written confession comprises eight typewritten pages, double spaced, of questions by the assistant district attorney and the answers of the defendant from which we quote, in part, the following:

"Q. William what made you do that?

"A. The Devil got in me I reckon — I was mad.

"Q. What was the trouble, what caused you to do that?

"A. Well, when I found out there was something wrong with her and I had dealings with her.

"Q. Which one was that?

"A. That biggest one, Hrell.

"Q. Have you ever had any sexual relations with her?

"A. Yes, sir, once. * * *

"Q. Had your wife asked Hrell about what shape she was in and who did it?

"A. Yes, sir she asked her. * * *

"Q. What made you decide to kill Hrell?

"A. On account of the way she was.

"Q. On account of her condition — because she was in the family way and you was afraid she would say you did it. Was that it?

"A. Yes, sir. * * *

"Q. Just go ahead and tell us how the girls happened to go down to the slough, and how you went down there and about how they were killed.

"A. Well, Hrell wanted to go down there and get some water, she had already spoke about washing, and I told her I would go down there with her and get it, and when we got down there she walked out on the log and got two bucketsful in the tub and when she went to get another one I pushed her on off and when she got up again I pushed her off again and I got hold the sides of her head and soused her under.

"Q. How did you hold her — did you have to bruise her to hold her under the water?

"A. No, sir. I didn't have to bruise her. You don't have to bruise anybody, just hold them under the water.

"Q. How did you hold her — with your open hands on each side of her face and shove her right under?

"A. Yes, sir.

"Q. How many times did you do that?

"A. I pushed her back twice.

"Q. Where were the two little girls while you were drowning her?

"A. They was standing there.

"Q. Did they know you were drowning her?

"A. No, sir. They didn't know — they was small and they thought I was playing.

"Q. How come you to drown the two little ones?

"A. Well, they was there and seen it.

"Q. You were afraid they would tell?

"A. Yes, sir. * * *

"Q. After you drowned those children what did you do then?

"A. I went up on the hill and called the other children.

"Q. Where were the other children?

"A. There was two around back of the house and the other one was asleep.

"Q. What did you tell the other children?

"A. I told them to come down there and to help me look for them.

"Q. Did you look around the place for them?

"A. Yes, sir.

"Q. About how long did you look around the place for them before you went back down to the slough?

"A. I reckon it was about ten minutes maybe. * * *

"Q. After you brought the babies out what did you do?

"A. I went out to Mr. Liveley's and sent word to Mr. Cobb.

"Q. What you have just told us is the way those three children met their death?

"A. Yes, sir."

On the 17th day of September, 1936, the grand jury met and indicted the defendant for the murder of the three children in three counts in one indictment. On the following day the trial judge, after having been informed by the defendant in open court that he could not employ. counsel, appointed, as leading counsel to represent him in the trial of the case, C. P. Thornhill, an attorney of Columbia, Caldwell parish, who has had about thirty years of experience as a practitioner at the Bar and who had, for a number of years, served as prosecuting attorney. The court also appointed J. H. Dorman and D. Ross Bannister, attorneys of the Monroe Bar, to assist Mr. Thornhill. The defendant, with the assistance and in the presence of his counsel, was arraigned in open court and entered a plea of not guilty on the 25th of September. The court then fixed the date for the trial of the case on October 13th. On the 8th day of October, five days before the day set for the trial, after conferring with the defendant, Mr. Thornhill resigned as leading counsel and W. H. Mecom, also an attorney of the Caldwell Parish Bar, who has been practicing law for more than five years, was appointed by the court in his stead as leading counsel to represent the defendant.

On the morning of the day set for the trial, counsel for defendant sought to file two motions, one to quash the indictment and the other to quash the grand jury panel, the general venire list, and the petit jury panel. The allegations in each motion are to the effect that the general venire boxes of Caldwell parish contained the

name of only one negro at the time the panel for the grand jury was drawn, which later indicted him, and also the petit jury which was drawn to try him; that negroes have been systematically excluded from grand jury and petit jury service in the parish of Caldwell; that the exclusion of negroes from juries is done solely because of their race and color which constitutes a denial of due process of law and the equal protection of the laws guaranteed to him by the Federal and State Constitutions (Const.U.S. Amend. 14; Const.La.1921, art. 1, § 2).

Defendant was not allowed to file the first motion on the ground that it came too late, under the provisions of article 284 of the Code of Criminal Procedure and the established jurisprudence of this state. State v. White, 156 La. 770, 101 So. 136.

We deem it unnecessary to further discuss the motion to quash the indictment because, after a hearing on the motion to quash the general venire list, the grand jury, and the petit jury panel, the court allowed the motion in so far as it sought to quash the general venire list and the petit jury panel, and all the matters pertaining to these motions are based upon one and the same ground, that is, the systematic exclusion of negroes from grand and petit juries in Caldwell Parish.

It is obvious that counsel has attempted to build his case to fit the decision of the Supreme Court of the United States in the matter of Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 580, 79 L.Ed. 1074. In that case the court reannounced the following principle of law.

"Whenever by any action of a state, whether through its Legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. * * * The principle is equally applicable to a similar exclusion of negroes from service on petit juries."

The Supreme Court of the United States then proceeded to apply "this established principle to the facts disclosed by the record" and found as a fact "that no negro had served on any grand or petit jury in that county [Jackson] within the memory of witnesses who had lived there all their lives. Testimony to that effect was given by men whose ages ran from fifty to seventy-six years. *Their testimony was uncontradicted.*" The court held that *"that testimony in itself made out a prima facie case of the denial of the equal protection which the Constitution guarantees,"* and stated further that: "The case thus made was supplemented by direct testimony that specified negroes, thirty or more in number, were qualified for jury service. * * * It also appeared that negroes from that county had been called for jury service in the federal court. Several of those who were thus described as qualified were witnesses." (Italics ours.) The court's final conclusion on the subject is as follows:

"We think that the evidence that for a generation or longer no negro had been called

for service on any jury in Jackson county, that there were negroes qualified for jury service, that according to the practice of the jury commission their names would normally appear on the preliminary list of male citizens of the requisite age but that no names of negroes were placed on the jury roll, and the testimony with respect to the lack of appropriate consideration of the qualifications of negroes, established the discrimination which the Constitution forbids. The motion to quash the indictment upon that ground should have been granted."

The rule of law announced by the Supreme Court of the United States in the case of Norris v. State of Alabama, supra, had long before been established in the jurisprudence of this state. But that rule does not entitle a person to be tried by a jury composed only of white, or only of black, or mixed persons, and while it is true that there must be no distinction in selecting the jury based on race or color, the jury commission should select persons whom they know to be competent, regardless of whether they are white or black, and if all but a few of the persons placed in the general venire list happen to be white, it will be presumed, in the absence of evidence to the contrary, that the list was so selected by the jury commission in a fair effort to select the best qualified persons and not with any view of discrimination on account of race or color. See State v. Turner et al., 133 La. 555, 63 So. 169.

This court has never hesitated to set aside convictions and sentences of persons whether of the black or of the white race, whenever it appeared that any discrimination or unfair or unjust tactics had been employed in the prosecution and conviction, and it is with this principle in mind that we shall review the evidence in this case.

■ The evidence in support of the motions consisted of the testimony of H. W. Seal, clerk of court and ex officio member of the jury commission for Caldwell parish; M. L. Mecom, an old resident of Caldwell parish, who served as clerk of court for that parish from 1892 to 1932, with the exception of eight years; and W. H. Waggoner, also an old resident of Caldwell parish, who is a member of the jury commission for that parish and who has served on the commission from time to time since he has been a resident of Caldwell parish.

A review of the evidence on this motion shows that the population of Caldwell parish is about 11,000 people, of which about 25 per cent. are colored. Mr. Saul testified that he imagined it was one-fourth or one-third negroes, and in answer to the question whether or not there were qualified negroes, he said, "I think so," and when asked what the percentage was, he answered, "I don't know." He also testified that "as long as I have been in office there has always been the names of a negro or negroes in the box." Mr. Mecom testified that about 30 per cent. of the population of Caldwell parish consisted of negroes, and that about one-half of one per cent. were qualified, and in an effort to estimate the approximate number qualified to serve as jurors, stated, "probably 75." But the trial judge in his per curiam said, "this is an exaggerated estimate," and his estimate was approximately twenty-five negroes.

The three witnesses, who were called to testify, stated that there has always been one or more negroes on the jury list and that no discrimination was exercised in the selection of persons for jury service in Caldwell parish.

Unlike the Scottsboro Case, in this case there is no evidence pointing to any particular negro who was qualified · to serve. The evidence shows that there are some negroes qualified within the parish for jury service, which at best are only estimates or opinions of a former clerk of court and of the district judge. The record is totally barren of any evidence tending to show that any negro was excluded from the jury list because of his color or race. On the contrary, we think that the testimony shows, as is summarized in the per curiam of the trial judge, that negroes, during the past thirty or forty years, have been constantly included in every jury list and have served on petit and grand juries. The evidence does not show that one or two negroes on the jury list is not a fair and just proportion of negroes in comparison with the white persons qualified to serve as jurors in that parish. It stands to reason that if there are only 25, or "probably 75" as testified to by one witness, negroes qualified to serve as jurors in the parish, in the drawing of a venire list of 300 twice a year, hardly more than 2 or 3 could be reasonably and fairly expected to be placed on any one venire list. Defendant in this case does not even contend that he did not receive a fair and impartial trial, nor does he claim that he was not properly and justly convicted, or that a negro jury would not have convicted him; nor that he is

innocent. His sole and only defense is an effort to bring his case within the decision of the Supreme Court of the United States in the case of Norris v. State of Alabama, supra.

There is no feeling or prejudice on account of race or color in this case as there was in the Scottsboro Case. That case involved a most heinous crime by a group of negroes on the person of a white woman, whereas in this case, the defendant, a negro, murdered three children of his own color, two being his own children, and the feeling, if any existed in that parish, was principally among the people of his own race and color.

Our conclusion, from a careful study of the entire record, is that there was no discrimination shown because of race or color in this case in the drawing of the jury list from which were drawn the grand jurors, who later indicted the defendant, and the petit jurors, who convicted him. The defendant received every consideration at the hands of justice. He was tried fairly and impartially in the same manner and under the same procedure as all other people are tried in the State of Louisiana, regardless of their race or color and that is all that is required by the equal protection clause of the Constitutions of this State and of the United States.

We find no error in the court's ruling either as to bill of exception No. 1 or bill of exception No. 2.

Immediately after the court overruled the two motions, the counsel for defendant filed a motion for a continuance based on the ground that they did not have time to

adequately prepare his defense, but when the court announced that counsel would be granted such time as they required to properly prepare his defense, they immediately withdrew the motion for a continuance. This, we think, conclusively shows the fairness with which the defendant was treated during his trial.

The next bill of exception was reserved to the court's refusal to grant the defendant a change of venue. A review of the testimony offered in connection with this bill shows that the trial judge's conclusion, that the defendant had not established by the testimony offered that he could not receive a fair and impartial trial in the parish of Caldwell, was correct. The motion was therefore properly denied.

The defendant, with full reservation of his rights under the bills of exception Nos. 1, 2, and 3, was tried and found guilty as charged, but before he was sentenced, his counsel filed a motion for a new trial setting forth the alleged errors already pointed out in the first three bills of exception, with the additional grounds that: (1) The verdict was contrary to the law and the evidence, and (2) that Mr. C. P. Thornhill, who was originally appointed by the court to represent the defendant did not advise with the defendant or, in fact, make any effort to protect his rights in the premises, and therefore defendant did not have any one to look after his interests until October 8, 1936, when his present leading counsel, Mr. Mecom, was appointed. The trial judge, after due hearing on this motion, denied it and stated in his per curiam his reasons therefor, to wit:

"The motion for a new trial was denied for the law and the evidence beyond any doubt justified the verdict. The other points raised in the motion have practically been given by the court for denial in its per curiam to bills Nos. One and Two. While William H. Mecom was only appointed as attorney on the 8th of October in the place of C. P. Thornhill, and the case was tried on the 13th of October, Mr. Mecom filed a motion for a continuance but afterwards withdrew it. When the Court informed him that it would give him additional time to prepare the defense if he needed it Mr. Mecom then withdrew his motion for continuance and said he was ready for trial. The defendant was represented throughout the trial by attorneys who had been practicing law for more than five years as the law directs. There is nothing to the motion that C. P. Thornhill was only appointed after arraignment. The minutes show that he was appointed to try the case, and on oath, he states that he accepted the appointment with the intention of defending the case throughout the entire trial, but that it was several days after the arraignment he was talking with the defendant and from facts he then obtained from the defendant he determined to withdraw from the case if permitted. Again we wish to state that the Judge offered to continue the case for several days if Mr. Mecom desired more time for the purpose of preparing the defense and he stated that he didn't want same; that he was ready to go to trial.

"For these reasons and for reasons in Bills One and Two given, we refused a new trial."

We are of the opinion that the ruling of the trial judge in refusing to grant the defendant a new trial was correct.

■ Bill of exception No. 5 was reserved to the ruling of the trial judge in refusing to grant a motion in arrest of judgment, which motion was leveled at the entire proceedings and particularly the rulings of the court which are the basis of the first four bills of exception. In his per curiam attached to the last bill of exception, the trial judge stated:

"This motion was denied for the reason the motion in arrest of judgment, as we understand, must be leveled at facts patent on the face, and this motion was not so leveled, but if it was intended to be considered leveled at the whole proceedings, then the motion was denied for the reason stated in the previous bills of exception, and for the further reason there is nothing to show that the defendant was tried by a jury that was improperly drawn and selected by the Jury Commission. He was tried by a jury that was properly and legally drawn and selected by the Jury Commission as we understand the law. There is nothing in the record to show that the Jury Commission systematically excluded the names of negroes from the Grand Jury and Petit Jury box. We have stated in previous bills that negroes have been used and that the name of a negro was in the box and that it is useless to reiterate same."

The judge's ruling was correct because "a motion in arrest of judgment lies only for a substantial defect, patent upon the face of the record." Code of Criminal Procedure, art. 517. See, also, State v. Hart, 133 La. 5, 62 So. 161.

For the reasons assigned, the conviction and sentence are affirmed.