HIGGINS, Justice.
 

 The defendant, a negro, was indicted by the grand jury of Allen Parish for the murder of W. H. Bishop, a white man, the Chief of Police of the City of Oakdale, La., on July 18, 1943. The case was fixed for trial on November 22, 1943, and prior thereto the defendant timely and in proper form filed a motion to quash the indictment and a motion to set aside and annul the petit jury panel chosen to try the case.
 

 Both motions are founded upon identical grounds. It is alleged that the accused is a citizen of Louisiana and the United States; that he is a negro or a member of the colored race; that he is charged with the murder of a man of the white or Caucasian race; that after the occurrence, public opinion at Oakdale where the killing happened ran high against him and he was threatened with lynching, requiring the sheriff to remove him to another parish for safekeeping; that his plea will be self-defense; that in the Parish of Allen where the grand jury was drawn and chosen and in which the bill of indictment was returned against him, one-fourth of the entire population consists of negroes and one-fourth of them were qualified to act as grand and petit jurors at the time the grand jury was selected and indicted him; that no negro was chosen on the general venire list of 300 names out of which the grand jury was selected and from which the petit jury was drawn to serve in this case; that there is no person of the negro race on the list of 30 names from which the grand jury was selected and there was no person of the negro race on the grand jury; that there was no person of the negro race on the panel of petit jurors from which the jury must be chosen before whom he will be tried; that there has not been any person of the negro race drawn on any grand jury or petit jury selected to serve in the parish since it was created in 1912; that since 1912 to the present date one-fourth of the population of the Parish of Allen consisted of negroes and one-fourth of them are qualified to serve as grand or petit jurors; that the failure and refusal of the jury commissioners of the parish to include the name of any negro in the general venire list of- 300 from which the grand jury which indicted him was drawn and from which list the petit jurors were drawn to try him constituted gross discrimination against the members of the negro race in violation of the provisions of Article 172 of the Louisiana Code of Criminal Procedure, as amended, and the Constitution of this State and a denial of due process and the equal protection of the laws guaranteed him by Section 1 of the Fourteenth Amendment of the Constitution of the United States.
 

 
 *713
 
 After hearing the evidence presented by both the State and the accused on these issues, the district judge overruled both motions and counsel for the defendant reserved bills of exception Nos. 1 and 2, respectively. The case was continued until December 20, 1943, and the defendant filed another motion to quash the petit jury panel on practically the same grounds previously urged and this motion, after due hearing, was overruled, and bill of exception No. 3 was reserved. After a trial on the merits, the jury returned an unqualified verdict “Guilty as charged” and the accused was sentenced to death by electrocution.
 

 The defendant filed a motion for a new trial on the grounds that were urged in his previous motions and that the verdict of the jury was contrary to the law and the evidence. Upon being refused a new trial, he reserved bill of exception No. 4, and appealed to this Court.
 

 On the issues presented by the bills of exception Nos. 1 and 2, which we shall consider together, the accused offered five witnesses and the State, three. We shall summarize their testimony in that order.
 

 The secretary to the Superintendent of Education of the parish stated that the records show there were 2,937 white and 876 colored pupils in the public schools in the parish during the past year; that there were 8 colored schools, two of which were high schools, located in different towns and sections of the parish; that no one had ever attempted to deny persons of the colored race educational facilities or to discriminate against them because they were negroes; that the negro population was encouraged to attend school; and that there were a good many negroes residing in the Parish.
 

 One of the members of the Jury Commission stated that he had lived in the parish since its creation in 1912 and had served as a jury commissioner for 14 years; that a good portion of the population of the parish is made up of negroes; that to his knowledge there had never been a negro on either the grand or petit juries in the parish since it was created; that there had never been a negro on the general venire list of 300 names except one, whose name was placed on the general venire list from which the grand and petit juries in the instant case were drawn; that there was no negro on the grand or petit jury for that term of court; that there had not been any systematic and deliberate attempt by the members of the jury commission to exclude negroes on account of race or color from jury service; that the jury commission selected those to serve on the grand and petit juries in accordance with the qualifications required by the statute, that is, that they be citizens of the State and of the United States, not less than 21 years of age, able to read and write the English language and not convicted of any felony and not under any criminal charge and known for their good character and standing in the community; and that he and the other members of the jury commission had no prejudice against either the accused or members of the colored race.
 

 A member of the jury commission who lived in the parish since it was created and had served on the jury commission 12 or 14 years stated that there were negroes
 
 *715
 
 who resided in and worked throughout the parish, there being a greater number of them in some wards than others; that in making up the general venire list race, color or previous condition of servitude had no bearing on the selection of the names of persons placed in the general venire box and their legal qualifications and competency alone were considered; that he had never heard of a negro being lynched in the parish and that he had never heard any of them complain that they did not receive just, fair, and legal trials in the courts; and that there had never been a negro to serve on either the grand or petit jury since the parish was created and only the name of one negro had been placed in the general venire box from which the grand and petit juries composed exclusively of white persons were drawn.
 

 Another member of the jury commission, who was a lifelong resident of the parish, in substance, confirmed what the two previous commissioners had stated.
 

 The Clerk of Court, who had served for several years in that capacity and as a deputy clerk, and who is also ex-officio a member of the jury commission, stated that there were a great many negroes living in the parish but he would not say that they equaled one-fourth of the total population; that there were several colored sections in the parish; that he had never heard of any lynching or mistreatment of negroes because of race, even though a crime was committed against a white man; that the negroes were fairly and justly treated by the white people and the courts; that there had not been any discrimination against the negroes serving on juries because they were of the African race; that a majority of the negro population of the parish was illiterate; that a large portion of them are under the age of 21 years; that a number of them were charged with criminal offenses; that some of them are not of good character; and that in his opinion less than 5% of them could qualify for grand and petit jury service.
 

 The Registrar of Voters, who held that office for three and one-half years, and who had lived in Allen Parish since its creation, stated that' no one had ever attempted to prevent the negroes from registering to vote but that none had ever applied for registration; that he had never heard of any race disturbances of any proportion or any systematic and deliberate plan or action of the jury commission or anyone connected with it to keep negroes off the grand or petit juries, if they were qualified; and that there are colored schools all over the parish and he estimated the colored population somewhere between 10% and 15%.
 

 Another man who resided in the parish since 1912 and who had served as a member of the jury commission states that he had never heard of any mistreatment or lynching of negroes by the white people and that they had always received fair and just treatment like the white people in the courts and there had never been any organized action by the whites against the negroes.
 

 The final witness was the Sheriff of the parish, who had served in that capacity and as a deputy for nine years. He stated that the white and colored people had always lived in perfect harmony and understanding; that the negroes were granted tax ex
 
 *717
 
 emptions, the privilege of registering and voting, and all other rights accorded to the white people who were legally qualified and entitled to them; and that he had never heard of any lynching or organized opposition to negroes by the members of the Caucasian race.
 

 The trial judge, in his per curiam, found that “approximately ten to twenty per cent of the total population of the Parish is colored, and that considerable less than this percentage could qualify for jury service.” He was of the opinion that the defendant, a negro, has not a constitutional right to demand a jury composed in whole or in part of colored men in a case simply because he is charged with an offense against a white man; that the evidence showed that the jury commissioners selected the names of persons to place in the general venire box solely with reference to their competency or legal qualifications under the law to serve and that there was not sufficient proof to show that there had been any discrimination against members of the negro race on account of color or race and, consequently, the accused was not entitled to complain of a denial of the equal protection of the law. It appears that the trial judge did not overestimate the percentage of the colored population of Allen Parish, because the 1940 census shows 12,986 white and 4,421 negro residents, or that 25% of the population is colored.
 

 The first two motions to quash the indictment and petit jury were considered and overruled by one of the district judges but the third one to quash the petit jury venire of December 30, 1943, was heard and overruled by the other district judge of the same court, who presided over the trial on the merits. The evidence taken in connection with the third motion indisputably shows that the jury commissioners met as they were required by law to do, for the purpose of replenishing the general venire box, and placed 30 names therein to replace those that had been previously drawn for petit jury service. Of these 30 names, 4 were those of negroes.
 

 Article 172 of the Louisiana Code of Criminal Procedure reads:
 

 ■ “The qualifications to serve as a grand juror or a petit juror in any of the courts of this State shall be as follows:
 

 “To be a citizen of this State, not less than twenty-one years of age, a bona fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color or previous condition of servitude; and provided further, that the District Judge shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.
 

 “In addition to the foregoing qualifications, jurors shall be persons of well known good character and standing in the community.”
 

 Paragraph 1 of the Fourteenth Amendment of the Constitution of the United
 
 *719
 
 States provides: “ * * * no State shall *
 
 *
 
 * deny to any person within its jurisdiction the equal protection of the laws.”
 

 In the case of Hill v. Texas, 316 U.S. 400-406, 62 S.Ct. 1159, 86 L.Ed. 1559, the defendant was indicted for the crime of rape and filed a motion to quash the indictment on the ground that he was denied the equal protection of the laws guaranteed to him by the Fourteenth Amendment of the Constitution because negroes had been systematically excluded from the grand jury on account of their race. After a hearing, the trial court denied the motion and on the trial of the case on the merits, the accused was convicted. The Texas Court of Criminal Appeals, 144 Tex.Cr.R. 415, 157 S.W.2d 369, affirmed the judgment holding that the accused had not sustained the burden of proof to show that negroes were excluded from the grand jury on account of their race and not a lack of statutory qualifications. The Texas statute is somewhat similar to our own in providing for the qualifications of those competent to serve as grand jurors. It appeared that about one-seventh of the population of Dallas County consisted of negroes and that during the period of twenty-five years a negro had not been called on the grand jury. It also appeared that negroes were attending the grade schools and high schools and some entered college. In annulling the judgment of conviction, the Supreme Court of the United States said [316 U.S. 400, 62 S.Ct. 1161, 86 L.Ed. 1559]:
 

 “We think petitioner made out a prima facie case, which the state failed to meet, of racial discrimination in the selection of grand jurors which the equal protection clause forbids. As we pointed out in Smith v. Texas, supra, 311 U.S. [128], 131, 61 S.Ct. [164] 165, 85 L.Ed. 84, [86], chance or accident could hardly have accounted for the continuous omission of negroes from the grand jury lists for so long a period as sixteen years or more. The jury commissioners, although the matter was discussed by them, consciously omitted to place the name of any negro on the jury list. They made no effort to ascertain whether there were within the county members of the colored race qualified to serve as jurors, and if so who they were. They thus failed to perform their constitutional duty — recognized by § 4 of the Civil Rights Act of March 1, 1875, * * * 8 U.S. C.A. § 44, and fully established since the decision in 1881 of Neal v. Delaware [103 U.S. 370, 26 L.Ed. 567], supra — not to pursue a course of conduct in the administration of their office which would operate to discriminate in the selection of jurors on racial grounds. Discrimination can arise from the action of commissioners who exclude all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case discrimination necessarily results where there are qualified negroes available for jury service. With the large number of colored male residents of the county who are literate, and in the absence of any countervailing testimony, there is no room for inference that there are not among them householders of good moral character, who can read and write, qualified and available for grand jury service.
 

 
 *721
 
 “More than sixty years ago, in Neal v. Delaware, supra, 103 U.S. 397, 26 L.Ed. 567 [574], a case substantially like the present, this Court laid down the rule which we think controlling here: ‘The showing thus made, including, as it did, the fact (so generally known that the court felt obliged to take judicial notice of it) that no colored citizen had ever been summoned as a juror in the courts of the State,- — although its colored population exceeded twenty thous- and in 1870, and in 1880 exceeded twenty-six thousand, in a total population of less than one hundred and fifty thousand,-— presented a prima facie case of denial, by the officers charged with the selection of grand and petit jurors, of that equality of protection which has been secured by the Constitution and laws of the United States. It was, we think, under all the circumstances, a violent presumption which the State court indulged, that such uniform exclusion of that race from juries, during a period of many years, was solely because, in the judgment of those officers, fairly exercised, the black race in Delaware were utterly disqualified, by want of intelligence, experience, or moral integrity, to sit on juries.’
 

 “And recently we held in Pierre v. Louisiana [306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757], supra, that a prima facie case of race discrimination had been established where there had been a long-continued failure to select colored citizens for service on grand juries in a county, 50 per cent of whose population, or approximately 7,-000, were colored, of whom from 70 to 80 per cent were shown to be literate. We thought as we think here that had there been evidence obtainable to contradict the inference to be drawn from this testimony, the state would not have refrained from introducing it, and that the evidence which was introduced sufficiently showed that there were colored citizens of the county qualified and available for service on the grand jury.
 

 “A prisoner whose conviction is reversed by this Court need not go free if he is in fact guilty, for Texas may indict and try him again by the procedure which conforms to constitutional requirements. But no state is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid. Nor is this Court at liberty to grant or withhold the benefits of equal protection, which the Constitution commands for all, merely as we may deem the defendant innocent or guilty. Tumey v. Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749 [759], 50 A.L.R. 1243. It is the state’s function, not ours, to assess the evidence against a defendant. But it is our duty as well as the state’s to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand because the Constitution prohibits the procedure by which it was obtained. Equal protection of the laws is something more than an abstract right. It is a command which the state must respect, the benefits of which every person may demand. Not the least merit of our con
 
 *723
 
 stitutional system is that its safeguards extend to all — the least deserving as well as the most virtuous.”
 

 In Norris v. Alabama, 294 U.S. 587-599, 55 S.Ct. 579, 581, 79 L.Ed. 1074, 1075, the defendant was indicted for rape and moved to quash the indictment and the trial venire on the grounds of arbitrary exclusion of negroes from juries because of their race and color in violation of the equal protection clause of the Fourteenth Amendment of the Federal Constitution. The motion was denied, the accused convicted, and the Supreme Court of Alabama affirmed the judgment. Of the total population of 36,-881, 2,688 were negroes. Out of the male population over 21 years of age numbering 8,801, 666 were negroes. The provisions of the statute fixing the qualifications of jurors are very much like those of the Louisiana statute. None of the witnesses could remember when a negro had ever sat on a grand or petit jury for more than 24 years and in the entire history of the county. The evidence showed that the clerk under the direction of the jury commissioners, who have a wide discretion under the law, made up a preliminary list of names taken from the polling, registration and tax lists, the telephone directory and other available sources. The clerk stated that he included all male citizens between the ages of 21 and 61 years of age, without regard to their qualifications. The commissioner testified that the abbreviation “col.” was placed after the names of the negroes. With the assistance of those informed in different localities the commissioner prepared the final jury roll of qualified jurors. The commissioner testified that the selections were made without inquiry as to color and no one was systematically excluded on account of race or color. With reference to the fact that a negro was never known to sit on either the grand or petit jury for at least twenty-four years, although there were negroes in the county during that time, the court observed, “That testimony in itself made out a prima facie case of the denial of the equal protection which the Constitution gujarantees. * * * ” Later, the court, in annulling the judgment of conviction, stated:
 

 “ * * * We think that the evidence that for a generation or longer no negro had been called for service on any jury in Jackson county, that there were negroes qualified for jury service, that according to the practice of the jury commission their names would normally appear on the preliminary list of male citizens of the requisite age but that no names of negroes were placed on the jury roll, and the testimony with respect to the lack of appropriate consideration of the qualifications of negroes, established the discrimination which the Constitution forbids. The motion to quash the indictment upon that ground should have been granted. * * *
 

 “In Neal v. Delaware [103 U.S. 370, 26 L.Ed. 567], supra, decided over fifty years ago, this Court observed that it was a ‘violent presumption,’ in which the state court had there indulged, that the uniform exclusion of negroes from juries, during a period of many years, was solely because, in the judgment of the officers, charged with the selection of grand and petit jurors, fairly exercised, ‘the black race in Delaware were utterly disqualified by want of intelli
 
 *725
 
 gence, experience, or moral integrity, to sit on juries.’ Such a presumption at the present time would be no less violent with respect to the exclusion of the Negroes of Morgan county. And, upon the proof contained in the record now before us, a conclusion that their continuous and total exclusion from juries was because there were none possessing the requisite qualifications, cannot be sustained.”
 

 In the case of Smith v. Texas, 311 U.S. 128, 132, 61 S.Ct. 164, 165, 85 L.Ed. 84, 85, the accused, a negro, was indicted for and convicted of the crime of rape. The neg-roes constituted over 20% of the population, 10% of whom were poll taxpayers and between 3,000 and 6,000 possessed the qualifications prescribed by the Texas statute for grand jury service. From 1931 through 1938, it appeared that 5 of 384 grand jurors who served were negroes. Out of 512 persons summoned for grand jury duty, 18 were negroes. Of these 18, the names of 13 appeared as the last name on the sixteen man jury list from which 12 men were selected as grand jurors in the order that their names appeared on the list. Of the 5 negroes summoned for grand jury services who were not given the number 16, four were given the numbers between 13 and 16 and one was given the number 6. As a result of this manner of numbering, only 5 of the 18 negroes summoned ever served, whereas 379 out of 494 white men summoned actually served. Of 32 grand juries empaneled, only 5 had negro members or 27 had none. Of the 5 grand juries that had negro members, the same individual served three times, the result being that only three individual neg-roes served at all. It appeared that there had been no negro on the grand juries in the year of 1938 when the defendant was indicted. He petitioned the Supreme Court of the United States to annul the conviction based on an indictment which was returned in violation of the equal protection provisions of the Fourteenth Amendment. He contended that the evidence showed intentional and systematic exclusion of neg-roes from grand jury service solely on account of color and race. The trial judge and the court of last resort of Texas held that the evidence did not support the charge of racial discrimination. The United States Supreme Court pointed out that it was its duty to independently consider the evidence in the record and that while the provisions of the Texas statute were not unfair, the wide discretion lodged in the jury commissioners made it possible for them to prescribe any group in the administration of the law. In setting aside the conviction, the Court said:
 

 “ * * * Chance and accident alone could hardly have brought about the listing for grand jury service of so few negroes from among the thousands shown by the undisputed evidence to possess the legal qualifications for jury service. Nor could chance and accident have been responsible for the combination of circumstances under which a negro’s name, when listed at all, almost invariably appeared as number 16, and under which number 16 was never called for service unless it proved impossible to obtain the required jurors from the first 15 names on the list.
 

 “The state argues that the testimony of the commissioners themselves shows that
 
 *727
 
 there was no arbitrary or systematic exclusion. And it is true that two of the three commissioners who drew the September, 1938, panel testified to that effect. Both of them admitted that they did not select any negroes, although the subject was discussed, but both categorically denied that they intentionally, arbitrarily or systematically discriminated against negro jurors as such. One said that their failure to select negroes was because they did not know the names of any who were qualified and the other said that he was not personally acquainted with any member of the negro race. This is, at best, the testimony of two individuals who participated in drawing 1 out of the 32 jury panels discussed in the record. But even if their testimony were given the greatest possible effect, and their situation considered typical of that of the 94 commissioners who did not testify, we would still feel compelled to reverse the decision below. What the Fourteenth Amendment prohibits is racial discrimination in the selection of grand juries. Where jury commissioners limit those from whom grand juries are selected to their own personal acquaintance, discrimination can arise from commissioners who know no negroes as well as from commissioners who know but eliminate them. If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand.”
 

 Applying the rule of the above authorities to the facts in the instant case, it will be noted that between 10% and 20% of the total population of the Parish consisted of colored people, and that considerably less than that percentage could qualify for jury service; that there were eight schools throughout the parish, including two high schools where 876 colored pupils attended as compared to 2,937 white ones; that never in the thirty-one years of the parish’s history had a negro ever served on a grand or petit jury; and that just one negro’s name was placed in the general venire box containing 300 names, but after the first two motions to quash were filed herein, the jury commissioners, in supplementing the general venire list with 30 additional names, so as to bring the number of names therein contained up to 300 to- replace the 30 drawn for petit jury service, included four negroes. In the words of the Supreme Court of the United States, this evidence established a prima facie case. The only testimony offered by the State to overcome this showing was that of the commissioners, who denied that they had discriminated against negroes on account of race or color and testified that the negroes had always been fairly treated by the white people and the courts in the administration of justice. The State made no effort to have the commissioners narrate the manner or way in which they selected the 300 names placed in the general venire box. They do not say they made any investigation, inquiry or effort to determine how many negroes were qualified to serve as grand and petit jurors. Thus, in the administration of the law, they failed to perform a duty placed upon them by the constitutional provisions in question as construed and applied by the highest court in our land. The general statements by the jury commissioners, the clerk of court, the sheriff and the registrar of voters that they had never known of the white people or
 
 *729
 
 ganizing against the negroes or of any instance where there was any lynching or violence, coupled with the jury commissioners’ statements that they did not discriminate against negroes because of race or color, are not sufficient to overcome the case made out by the defendant, under the holding of the United States Supreme Court. The State’s own evidence shows that negroes were encouraged to attend the eight schools provided for them throughout the parish and that they had availed themselves of the opportunity to do so. This tends to corroborate the defendant’s position that there were a number of neg-roes in the parish possessing the statutory qualifications to serve as grand and petit jurors in the parish. When the jury commissioners themselves selected 30 additional names to be placed in the general venire box, they included the names of 4 negroes. Yet, when they previously selected 300 names, before the present issue was raised, they put the name of only one negro on the list. The complaint is not with our statute which prohibits distinction on account of race or color but with the practical administration of the law because discrimination existed that denied the accused the equal protection of the laws in violation of the first paragraph of the Fourteenth Amendment, as construed by the United States Supreme Court.
 

 We have considered the cases of State v. Pierre, 198 La. 619, 3 So.2d 895, and State v. Gill, 186 La. 339, 172 So. 412, 416. In the former, the court found the evidence showed that the jury commission made up its own list which contained the names of both white and colored persons whom they considered competent and qualified to serve as jurors. In short, the court concluded from the evidence that negroes were not excluded because of race or color. In the latter case, the court stated that "negroes, during the past 30 or 40 years, have been constantly included in every jury list and have served on petit and grand juries.” Necessarily, these two cases are not controlling here.
 

 For the reasons assigned, the judgment of conviction and the sentence of the district court are annulled, and the motion to quash the indictment is sustained.
 

 O’NIELL, C. J., did not take part.
 

 ODOM, J., absent.