144 So.2d 363

STATE of Louisiana

v.

Adam Amos MACK, Jr., et al.

No. 46027.

June 29, 1962.

Rehearing Denied Oct. 3, 1962.

J. B. Willis, St. Martinsville, A. J. Res-
weber, Jacob S. Landry, New Iberia, James
Domengeaux and Bob F. Wright, Lafayette,
for appellants.

Jack P. F. Germillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Knowles M. Tucker, Dist. Atty., Michael J. McNulty, Jr., Patrick T. Caffery, Asst. Dist. Attys., for appellee.

SANDERS, Justice.

The defendants, Adam Amos Mack, Jr. and Shelton Joseph Williams, appeal from their convictions of murder and sentences to death.

The circumstances of the crime are particularly brutal and revolting. On the evening of June 25, 1960, Mack, Williams and Kerry Joseph Feast, Jr., Negroes residing at Lafayette, travelled by automobile from Lafayette to a grocery store at New Iberia. They arrived in the vicinity of the store about 11:00 P.M. Feast, who was driving, remained with the automobile. Mack and Williams armed themselves with automobile jack handles and entered the store, which was attended by Elier Duhon, an elderly white man, and one Barras, a young man. They attacked the two attendants with the jack handles. Duhon was bludgeoned to death. Barras escaped and sought assistance. The assailants took approximately $200 from the person of Duhon. The trio escaped in the automobile but were apprehended in the early morning. Each of them made a written confession.

After trial the jury found the defendants, Mack and Williams, guilty as charged.

It found Feast guilty without capital punishment. Feast did not appeal.

In this Court Mack and Williams rely upon seven bills of exception, four by Mack and three by Williams.

Bill of Exception No. 1 (Mack) was reserved to the refusal of the court to appoint a physician at the East Louisiana State Hospital, a hospital for the mentally ill, as a member of the Lunacy Commission. The bill also alleges that counsel was denied the opportunity to test the qualifications of two members of the Lunacy Commission, and that the court erred in weighing the medical testimony on the issue of present sanity.

A week after Mack's incarceration, the trial judge on his own motion appointed a Lunacy Commission to examine him. During the course of his observation by this Commission, he was remanded to the East Louisiana State Hospital where it is alleged he received treatment. He was later released on orders of the Lunacy Commission.

After the defendant had pleaded present insanity and insanity at the time of the offense, the court appointed a subsequent Lunacy Commission. It was composed of Dr. Roy H. LaSalle, Coroner of Iberia Parish, Dr. Joseph C. Musso, a general practitioner in the parish, and Dr. Andrew Sanchez, a psychiatrist of New Orleans, Louisiana. Dr. Sanchez had also served on the previous Commission. The court

overruled a defense motion to appoint a member of the staff of the East Louisiana State Hospital. The Commission examined the defendant and reported that he was presently sane and able to assist in the proceedings against him.

LSA–R.S. 15:267 provides: " * * * The court may appoint two disinterested physicians to examine the defendant with regard to his present mental condition and to testify at the hearing." [1]

■ The law vests the appointment of the members of the Lunacy Commission in the discretion of the trial judge. It does not require that he appoint the physicians requested by the defendant. See State v. Faciane, 233 La. 1028, 99 So.2d 333.

■ The defendant also contends that the court should have heard the testimony of all physicians who examined Mack after his incarceration. Under LSA–R.S. 15:267, "Other evidence regarding the defendant's mental condition may be introduced at the hearing by either party." The defendant had the right to offer additional evidence. If the defendant did not exercise this right, he cannot now be heard to complain.

The defendant's next complaint under this bill of exception is that the court declined to permit defense counsel to attack the qualifications of the physicians composing the Lunacy Commission. The record reflects that the physicians were fully interrogated as to their qualifications. Hence we find no basis for this complaint.

In his per curiam to this bill of exception, the trial judge states:

"Doctors appointed possessed qualifications prescribed by law.

"Sanity at time of commission of crime and of trial was proved overwhelmingly.

"The court talked to Mack and observed him very carefully at every opportunity.

"He is sane."

■ Under the law the trial judge is given the exclusive responsibility of determining the mental capacity of a defendant under a plea of present sanity, subject to review only by this Court. A defendant asserting an abuse of discretion in this determination by the trial judge has the burden of establishing it.[2]

■ We have reviewed the evidence in the instant case and find no abuse of discretion.

1. LSA–R.S. 15:268 authorizes the court to appoint not more than three disinterested physicians to examine the defendant as to his sanity at the time of the commission of the offense.

2. State v. Rogers, 241 La. 841, 132 So. 2d 819; State v. Wilson, 240 La. 1087, 127 So.2d 158; State v. Faciane, 233 La. 1028, 99 So.2d 333.

Bill of Exception No. 1 (Mack) is without merit.

Bill of Exception No. 2 (Mack) and Bill of Exception No. 1 (Williams) were reserved to the overruling by the trial judge of a motion to quash the indictment, general venire, grand jury panel, and petit jury panel based upon racial discrimination in the drawing and selection of the juries. The evidence taken on the motion was made part of the bills of exception.

Specifically, the defendants contend that under the procedures used by the Jury Commission there was a planned limitation of the number of Negroes placed on the general venire and jury bodies in violation of the constitution and laws of the United States and this state.

■ The law is well settled that a defendant is denied the equal protection of the laws guaranteed by the Fourteenth Amendment if he is indicted by a grand jury or tried by a petit jury from which members of his race have been excluded because of their race.[3] Such racial discrimination is likewise prohibited by state law.[4] The law requires that a jury be selected without regard to race. This Court has recognized and applied these principles.[5]

■ Under the command of the law prohibiting racial discrimination in the selection of juries, a planned limitation of the number selected to serve on a jury body imposed on the basis of race is forbidden.[6]

In Cassell v. Texas, 339 U.S. 282, 70 S. Ct. 629, 94 L.Ed. 839, the Supreme Court of the United States declared:

"* * * Proportional racial limitation is therefore forbidden. An accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race."

■ Under the contentions of the defendants, our inquiry must be directed to whether the Jury Commission discriminated against Negroes in the formation of the juries by imposing an arbitrary limitation upon the number of that race selected or drawn for jury service. This is a question of fact.[7] The burden of establishing the discrimination rests upon the defendants.[8]

3. Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991; State v. Clark, 242 La. 914, 140 So.2d 1; State v. Goree, 242 La. 886, 139 So.2d 531.

4. Article I, Sections 2, 9, Louisiana Constitution of 1921, LSA; LSA–R.S. 15:-172.

5. See, e. g., State v. Goree, 242 La. 886, 139 So.2d 531; State v. Anderson, 205 La. 710, 18 So.2d 33.

6. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839; State v. Green, 221 La. 713, 60 So.2d 208; State v. Perkins, 211 La. 993, 31 So.2d 188.

7. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866; State v. Goree, 242 La. 886, 139 So.2d 531.

8. Fay v. New York, 332 U.S. 261, 67 S. Ct. 1613, 91 L.Ed. 2043; Akins v. Texas, 325 U.S. 398, 65 S.Ct. 1276, 89 L.Ed.

The record reflects that the trial judge had set aside a previous indictment of these defendants for the present offense based upon a finding of racial discrimination in the exclusion of Negroes from the jury lists. Thereafter, he gave written instructions to the Jury Commission in which he stated in part:

> " * * * The law is plain that jury commissioners cannot take into consideration the race of a prospective juror in passing upon his qualifications. That means, therefore, that you cannot effectively include a certain percentage of Negroes in the venire boxes any more than you can exclude any Negro because of his race."

Pursuant to these instructions the Jury Commission undertook to reconstitute the general venire and jury bodies. The testimony discloses 1000 names were drawn from the voting registration rolls according to a non-discriminatory formula of taking each twentieth or twenty-second name on the roll. From these the Jury Commission made eliminations because of disqualifications, thereby reducing the number to 835. In these eliminations the Commission made no discrimination because of race. The pool of 835 names included 124 Negroes. From this pool the Jury Commission drew indiscriminately 300 names for the general venire and 100 names for the tales jury box.

From the 300 names in the general venire, the Jury Commission selected twenty for the list of grand jurors. This list included four Negroes. The twenty names were placed in an envelope. From them the trial judge selected a foreman for the grand jury. The remaining eleven members of the grand jury were drawn by lot. These included three Negroes. One of the Negroes claimed his statutory exemption as a school teacher and was excused by the judge as provided by law.[9] Two Negroes served on the grand jury which returned the present indictment against the defendants.

After the selection of the grand jury list, the Jury Commission drew the petit jurors by lot from the general venire.

 It is clear from the record that no racial discrimination was practiced in the selection of the general venire or in the drawing of the petit jurors, who convicted the defendants. In this Court the defendants concentrate their attack on the selection of the grand jury list of twenty by the Jury Commission. In essence, the defendants contend that a fixed percentage of Negroes were selected for the grand jury list solely on the basis of race without regard to qualifications. This, it is reasoned,

1092; State v. Clark, 242 La. 914, 140 So.2d 1; State v. Fletcher, 236 La. 40, 106 So.2d 709, cert. den. 359 U.S: 974, 79 S.Ct. 891, 3 L.Ed.2d 840; State v. Perkins, 211 La. 993, 31 So.2d 188.

9. LSA-R.S. 15:174.

resulted in an arbitrary and unconstitutional limitation on the number of Negroes placed on the grand jury. With this contention we cannot agree.

LSA–R.S. 15:172 establishes the qualifications for grand jurors:

"The qualifications to serve as a grand juror or a petit juror in any of the courts of this state shall be as follows:

"To be a citizen of this state, not less than twenty-one years of age, a bona fide resident of the parish in and for which the court is holden, for one year next preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at any time of any felony, provided that there shall be no distinction made on account of race, color or previous condition of servitude; and provided further, that the district judge shall have discretion to decide upon the competency of jurors in particular cases where from physical infirmity or from relationship, or other causes, the person may be, in the opinion of the judge, incompetent to sit upon the trial of any particular case.

"In addition to the foregoing qualifications, jurors shall be persons of well known good character and standing in the community."

LSA–R.S. 15:180 provides a procedure for the creation of the list of grand jurors:

"Immediately after completing the general venire list, the commission *shall select* therefrom the names of twenty citizens, possessing the qualifications of grand jurors, to be taken from different portions of the parish, as far as practicable, who shall be subject to duty as grand jurors during the term of six months after the grand jury is impaneled and until a succeeding grand jury shall have been impaneled.

"The names of the persons so selected shall be written on slips of paper, by the clerk, in the presence of the commissioners and they shall place the slips in an envelope, seal the same and indorse thereon the words: 'List of Grand Jurors.'" (Italics ours)

It is clear that the law requires the Jury Commission to *select* the list of grand jurors based upon an evaluation of qualifications with proper regard to geographical distribution.

The official census of 1960 reflects that Iberia Parish had a population of 51,657, of which 14,781 were Negroes. The registered voters in the parish at the time of the trial numbered 21,023, of which 4,427 were Negroes. Of the jury pool of 835, drawn indiscriminately from the registration rolls, 124 were Negroes.

It is true that the Clerk of Court, a member of the Jury Commission called as a witness by the defendants, testified that the Commission deemed 16% to 20% of the grand jury list to be a fair representation of Negroes on the list. This percentage, he stated, was based roughly on the proportion of Negroes drawn for the initial pool of 835 from the registration rolls in a non-discriminatory manner. However, when his testimony is considered as a whole, it reflects that the percentage was not used as a limitation, but that the selection of the grand jury list was made on the basis of qualifications. He also testified:

"A. And necessarily, in choosing the whites as well as the negroes, we tried to get a good cross-section of the men in the parish. Those that were better qualified to serve on the Grand Jury of those 300 that we had there. And I don't remember—I think we had two negroes from Jeanerette and one from Loreauville and I think, one from New Iberia.

"Q. But you don't recall whether the negroes were chosen first or the whites were chosen?

"A. No sir, they were chosen all together. I mean, all at one time.

\* \* \* \* \* \*

"Q. I was going to ask you that. That was going to be my next question

"Now, is it your understanding that as a member of the Jury Commission and as Clerk of Court of this Parish that the law requires the Jury Commission to select the Grand Jurors?

"A. Yes sir.

"Q. Does it require the Jury Commission to have these Grand Jurors from any particular section of the parish that you know of?

"A. I don't know just what the law covers on that but we do try—we give a certain percentage to the different wards.

"Q. In other words, in selecting the Grand Jury, do you try to see that each section of the parish is represented?

"A. Yes sir.

\* \* \* \* \* \*

"Q. In other words, each name that is selected from your general venire for your Grand Jury, is that man's qualifications discussed by the Jury (Commission) as a whole?

"A. Yes sir.

"Q. Now, was anybody placed on that Grand Jury with the basis of his qualification and the sole and only basis of his qualifications strictly that he was white or colored?

"A. Strictly on his qualifications.

"Q. Did his color have anything to do with his qualifications to serve as a Grand Juror?

"A. No sir.

\* \* \* \* \* \*

"Q. Was there in any way an attempt or intent on the part of the Jury Commission to discriminate in favor for or against any race in selecting this Jury?

"A. No sir."

The eminent trial judge, who saw and heard the witnesses on this factual issue, states in his per curiam:

"The evidence shows very clearly that there was no discrimination in drawing and selecting petit and grand juries."

We conclude, as he did, that the defendants have failed to show racial discrimination in the selection of the list of grand jurors in the instant case. We do not understand the law to be that an indictment, which is an accusation only, must be set aside because members of a defendant's race have been intentionally included in the grand jury list. Such a rule would make it virtually impossible to legally impanel a grand jury under a system of selection which requires an investigation of competency and a weighing of qualifications. Under such a system, knowledge of a prospective juror's race on the part of the Jury Commission is inevitable.

As we stated in State v. Green, 221 La. 713, 60 So.2d 208:

"\* \* \* It would be fallacious, we think, to hold that, because jury commissioners, being conscious of the necessity of giving consideration to members of the colored race, as well as those of other races, in the selection of all juries in order to comply with the guarantees of the Fourteenth Amendment to the Federal Constitution, have purposely included Negroes on a jury panel, their forthright action constitutes discrimination in the absence of a showing that there was a planned limitation upon the number of Negroes to be chosen."

Bills of Exception No. 2 (Mack) and No. 1 (Williams) are without merit.

Bill of Exception No. 3 (Mack) and Bill of Exception No. 2 (Williams) were reserved to the overruling by the trial judge of a motion for severance.

The defendants allege in these motions that the three confessions are antagonistic, and that each defendant intended to use his co-defendant as a witness in his own behalf.

An examination of the statements reveals that each defendant admits participation in a planned robbery in which Duhon was killed. While there are some minor discrepancies in the statements, the only major conflict is in the identity of the defendant who struck the fatal blows. Mack as-

serted that Williams did. Williams, to the contrary, stated that Mack struck them.

LSA-R.S. 15:316 provides:

"Persons jointly indicted shall be jointly tried, unless the district attorney elect to place such persons separately upon trial, or unless the court, upon motion of defendant, shall, after a hearing contradictorily with the district attorney, order a severance."

The identical question raised by this motion was answered adversely to the position of the defendants in State v. Progue et al., La., 144 So.2d 352, No. 45,982 on the Docket of this Court handed down June 29, 1962. Therein we stated:

"As might be expected there were several minor and insignificant discrepancies, in the separately given statements. But only one major discrepancy was contained therein, it concerning which of the three accused struck the fatal blows. * * * Nevertheless, this attempt to shift blame could not and did not (of itself) suggest antagonistic defenses, because under the murder-felony doctrine it is immaterial which of the accused actually administered the beating. Since the three were together in the perpetration of the robbery each was chargeable as a principal, regardless of whether he dealt the specific blows which caused the death. LRS 14:24."

In the admission of the confessions, the trial judge properly safeguarded the right of each defendant by admitting them only to establish the guilt or innocence of the one who made it and so instructing the jury.

The granting of a severance rests in the sound discretion of the trial judge, and his ruling will not be set aside unless it is manifestly erroneous and injurious to the defendant. State v. Cook et al., 215 La. 163, 39 So.2d 898.

We find no manifest error in the instant case. Hence the bills of exception are without merit.

Bill of Exception No. 4 (Mack) and Bill of Exception No. 3 (Williams) were reserved to the admission of the confessions and the overruling of a motion for a new trial. It also reiterated the objections presented in the bills of exception previously disposed of, objected to the failure of the trial judge to order all the evidence taken and made part of the record on appeal, and asserted that the verdict was contrary to the law and the evidence.

The defendants contend that the statements of the defendants were not voluntary and were inadmissible.

To lay the foundation for admission of the confessions, the state offered the testimony of Chief of Police Andrew Viator and Captain Albert Darby, the offi-

cers to whom they were made. They testified that the statements were voluntary and that no coercion, intimidation, or promises were used in obtaining them. The defendants offered no evidence attacking the confessions.

The ruling of the trial judge admitting the confessions in evidence is correct.

The defendants also contend that the trial court committed prejudicial error in refusing to order all of the evidence taken and incorporated in the record without cost to the defendants. The evidence relating to each bill of exception was taken. They rely upon the decision of the Supreme Court of the United States in Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, 55 A.L.R.2d 1055.

This Court does not review the facts in a criminal case. The appeal is solely on questions of law. The evidence attached to the bills of exception in the instant case provides a full base for appellate review of the questions of law. Under these circumstances the trial court committed no error. The decision in Griffin v. Illinois, supra, is not controlling.[10]

The complaint that the verdict is contrary to the law and the evidence presents nothing further for review.

For the reasons assigned the convictions and sentences are affirmed.

10. State v. Rideau, 242 La. 431, 137 So. 2d 283. See also State v. Bueche, La.,

142 So.2d 381, No. 45,911 of the Docket of this Court, handed down June 4, 1962.