107 So.2d 632

**STATE of Louisiana**

v.

**Joseph Oliver JENKINS.**

No. 44048.

Dec. 15, 1958.

Rehearing Denied Jan. 12, 1959.

Joseph F. Monie, Gerard H. Schreiber, New Orleans, for defendant-appellant.

Jack P. F. Gremillion, Atty. Gen., M. E. Culligan, Asst. Atty. Gen., Richard A. Dowling, Dist. Atty., J. David McNeill, Executive Asst. Dist. Atty., New Orleans, for appellee.

FOURNET, Chief Justice.

The defendant, Joseph Oliver Jenkins, having been convicted on an indictment charging him with the murder of August P. During[1] and sentenced to death in the electric chair, prosecutes this appeal relying for a reversal of his conviction on nine out of ten bills of exceptions reserved during the proceedings in the court below.[2]

The first bill of exceptions, relied upon by appellant, was taken to the ruling of the trial judge,[3] who, at the termination of a lunacy hearing, adjudged the defendant presently sane and thus able to understand the proceedings against him and to assist counsel in his defense.

The issue of present insanity is to be determined solely by the trial judge, subject, however, to review by this court. See State v. Burnham, 162 La. 737, 111 So. 79; State v. Seminary, 165 La. 67, 115 So. 370; State v. Swails, 226 La. 441, 76 So.2d 523, certiorari denied 348 U.S. 983, 75 S. Ct. 574, 99 L.Ed. 765; and as was very aptly observed in the recent decision in the case of State.v. Riviere, 225 La. 114, 119, 72 So.2d 316, 317, and quoted with approval in the case of State v. Chinn, 229 La. 984, 87 So.2d 315, 320 "to warrant

---

1. It appears from the record that the defendant, a young Negro, while walking in the Carnival crowd in the vicinity of N. Roman and Canal Streets in the afternoon of March 5, 1957, Mardi Gras Day, collided with a young white man, August P. During, and without any provocation pulled a gun and fired seven shots, several of them after the victim has already fallen to the ground, causing almost instantaneous death.

2. Although counsel for the defense reserved ten bills of exceptions, Bill No. 6 was abandoned on this appeal.

3. Prior to trial, defendant's counsel, contending that defendant was unable to understand the proceedings against him and to properly assist counsel in his defense, filed a motion in conformity with R.S. 15:267 for the appointment of a lunacy commission, which motion was granted by the court, and a lunacy commission composed of Dr. Nicholas J. Chetta, Coroner for the Parish of Orleans; Doctors Alfred T. Butterworth and H. Tharp Posey was appointed "to inquire into and report to the court upon the present mental status of the defendant."

the sustaining of a plea of present insanity, thereby preventing trial of a criminal action, it must appear by a preponderance of evidence that the accused is so mentally deficient that he lacks capacity to understand the nature and object of the proceedings against him and to assist in the conducting of his defense in a rational manner."

In his per curiam, disposing of the bill of exceptions under consideration, the trial judge informs us that "when this defendant first appeared in my court for arraignment, a few weeks after the commission of the crime, he impressed me as a man who was either suffering from a very pronounced form of mental sickness or that he wanted very much to appear as such," and the judge concluded that after a full hearing he was convinced that the defendant was in fact malingering and that the court-appointed doctors were correct in their findings that the defendant "in their opinion [was] able to understand the proceedings against him and to assist in his defense."

██ A review of the entire testimony taken during the hearing as well as the testimony taken at the trial of the defendant, including certain state exhibits[4] referred to by the trial judge in his per curiam, leaves no doubt that the trial judge was correct in finding the defendant presently sane and able to undergo trial.

Contending that the grand jury and the petit jury venire were illegally drawn,[5] counsel for defendant reserved Bill of Exceptions No. 2 to the trial judge's denial of defendant's demurrer and motion to quash the indictment, the grand jury panel and the grand jury itself, and Bill No. 3 to the judge's denial of defendant's motion to quash the petit jury venire. Counsel for the defense further alleges that members of the accused's race were systematically excluded from the grand jury.

██ The trial judge in his per curiam, disposing of these two exceptions, points out that at the time of the drawing the jury wheel contained 469 names, left from the preceding months, to which the commissioners added 900 names, making a grand total of 1,369 names. The jury commissioners then drew 1,050 names which

---

4. These state exhibits consist of certain letters, directed to defendant's girl friend, his mother and former cell-mates, in which he instructs them to falsify testimony in regard to his alleged insanity, even to the extent of informing them exactly as to the incidents they were to report and admonishing them not to disclose receipt of these letters to defendant's own attorney.

5. In support of this contention defense counsel alleges that the drawing was in violation of R.S. 15:194, which requires that the jury commissioners make no drawing from a list of less than seven hundred and fifty names, unless in extraordinary cases; R.S. 15:195, which sets up the procedure for the drawing of petit juries; and R.S. 15:196, which provides for the method of drawing of grand juries.

were arranged in stacks of 25 names each. Five stacks of 25 names were then submitted to the Judge of Section "D", from which list the grand jury of twelve was selected, which returned the indictment against the defendant. The remaining stacks were allotted to the various sections of the criminal district court to serve on petit juries.

From the foregoing it is clear that there was no violation of any of the defendant's rights under Sections 15:194–196 of the Revised Statutes, and, furthermore, Section 15:203 specifically provides that "it shall not be sufficient cause to challenge the venire selected for any session of the court or portion thereof or for service at any time in any parish or district of this state, or to set aside the venire, * * because of any * * * defect or irregularity in the manner of selecting the jury, or in the composition, summoning or proceedings of the jury commission, unless some fraud has been practiced or some great wrong committed that would work irreparable injury". See State v. Foster, 32 La.Ann. 34; State v. Aspara, 113 La. 940, 37 So. 883; State v. Brantley, 175 La. 192, 143 So. 46; State v. Bussa, 176 La. 87, 145 So. 276; State v. Murphy, 234 La. 909, 102 So.2d 61, certiorari denied 357 U.S. 930, 78 S.Ct. 1376, 2 L.Ed. 2d 1373. No allegation of fraud was made, and there was no showing that a great wrong working irreparable injury had been committed.

Counsel for defendant's contention that there was a systematic exclusion of members of the colored race from the grand jury is equally without merit. A review of the record discloses that there is no evidence to support this contention, which is based primarily on counsel's assumption, as stated in his brief, that "the percentage of Negroes to white is almost one half; yet only three Negroes served on the grand jury which indicted the defendant and not one Negro was on the petit jury which tried him. Systematic exclusion is the only reason."

Although counsel for the defense did offer some evidence to show the number of Negroes in New Orleans who belong to the learned professions as well as the number of businessmen who are Negroes, there is not a scintilla of evidence as to the percentage of colored and white people qualified to serve as jurors. See State v. Pierre, 198 La. 619, 3 So.2d 895, certiorari denied 314 U.S. 676, 62 S.Ct. 186, 86 L.Ed. 541; State v. Fletcher, 236 La. 40, 106 So.2d 709. While it is true that only three Negroes served on the grand jury that indicted the defendant, as pointed out by the trial judge in his per curiam, 10–12 Negroes were members of the petit jury venire and were excused, *not on account of their race,* but because every single one stated on the voir dire examination that he entertained conscientious scruples against the infliction of capital punishment.

██ The next two bills involving certain statements made by the assistant district attorney during the voir dire examination of the jurors are interrelated and will be disposed of together. Bill No. 4 was reserved to the court's action in overruling defendant's objection to the statement that the jurors should be concerned *only* with the question of whether or not the defendant was insane at the time of the commission of the crime, and Bill No. 5 to the overruling of defendant's motion for a mistrial because of the statement that the jurors were not to consider the issue of *present insanity*, which had already been decided by the judge.

Counsel for defendant alleges that the first statement' was prejudicial in that it ignored the fact that defendant had pleaded both "not guilty" and "not guilty by reason of insanity", thus creating an inference that the jurors were to consider only the issue of insanity, and the second statement might have misled the jury to believe that the defendant was sane *at the time of the commission of the crime.*

. .These two bills are clearly without merit. The trial judge in his per curiam disposing of these bills informs us that he made it abundantly clear to the jury that the attorneys for each side were merely expounding their own theories of the case, and appreciation of the law and that he admonished the jurors to ignore statements as to the law made by either attorney, but to take the law from the court, as they were required to do under their oath.

A reading of the charges given by the trial judge to the jury, without objection by defendant's counsel, leaves no doubt that the jury was properly and thoroughly instructed as to the law applicable in this case.

██ Bills Nos. 7 and 8 were taken to the court's action in overruling defendant's objection to certain testimony of the witnesses Richard Pitcher and Albert Dupiere on the ground that it was hearsay and not part of the res gestae, since the witnesses were not attempting to quote what the victim or the defendant had said, but were attempting to quote what seemingly third persons had said.

The witness Richard Pitcher was one of the group of seven young people with whom the deceased August P. During, called Joe by his friends, had spent Mardi Gras Day. Pitcher testified that he was with the deceased during the entire day including the time of the shooting. He was walking slightly ahead of During when he suddenly heard two shots and upon turning around witnessed the defendant firing directly at the deceased, saw the victim falling to the ground and heard one of his friends exclaim "Joe's been shot." [6] Pitcher further testified that while

---

6. This statement was quoted twice by the witness Pitcher; once without objection, the second time defense counsel objected, but reserved no bill. Conse-

he was pursuing the defendant a man warned him "Look out, he [the defendant] has a gun waiting for you."[7]

The witness Albert Dupiere and his wife were parked in their car at the intersection of Canal and Roman, when the noise of "firecrackers or shots" directed their attention to the defendant, standing approximately 10–15 feet from the intersection, firing rapidly at During, who was dressed in convict's costume, which fact caused Mrs. Dupiere to believe momentarily that the shooting was merely a practical joke. The defendant ran across the street in front of Dupiere's car, and Dupiere took up pursuit (in his car), following the defendant as closely as he could and participating in defendant's capture by instructing nearby police officers as to the direction in which defendant tried to escape. Both Dupiere and his wife were at the scene when the defendant was apprehended by the police officers; they left their car, walked over to the defendant, and Mrs. Dupiere said "you shot that man,"[8] whereupon defendant confessed "it's my gun, I shot him, but he shot at me first."[9]

These two bills are totally without merit. The testimony reveals that the statements quoted by the witnesses were uttered spontaneously during the course of the same occurrence or transaction which started with the shooting and terminated with defendant's apprehension. Furthermore, Mrs. Dupiere's statement was made in the presence of the defendant and was used, not to show the truth of the matter, but to introduce defendant's confession, to explain the accompanying circumstances and to show what prompted defendant to make this obviously exculpatory statement. There is no doubt that the statements objected to were part of the res gestae as repeatedly defined and applied by this court. See State v. Horton, 33 La.Ann. 289; State v. Moore, 38 La.Ann. 66; State v. Desroches, 48 La.Ann. 428, 19 So. 250; State v. Davis, 162 La. 500, 110 So. 733; State v. Di Vincenti, 232 La. 13, 93 So.2d 676.

The last Bill of Exceptions (No. 9) was reserved to the ruling of the trial judge denying defendant's motion for a new trial. Defense counsel states in his brief that "this motion was not directed at the verdict of the jury as regards defendant's plea of 'not guilty', but as regards defendant's plea of 'not guilty by reason of insanity' ", and claims that "defendant bore

---

quently, this statement is not involved in Bill No. 7.

7. Defense counsel's objection was overruled by the trial judge on the ground that the statement was admissible as part of the res gestae. Bill No. 7 was reserved, counsel for the defense contending that this statement was inadmissible.

8. This statement forms the only basis for Bill No. 8.

9. Before introducing defendant's statement, it was clearly shown that it was made in a free and voluntary fashion.

the burden of proving by a preponderance of the evidence in the * * * case that he could not distinguish right from wrong at the time of the commission of the crime," and "even if he could distinguish right from wrong, he was incapable of exercising his will and adhere to the right."

It is specifically provided in R.S. 14:14 "if the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question, the offender shall be exempt from criminal responsibility." And in the case of State v. Dowdy, 217 La. 773, 47 So.2d 496, we held that "a plea of insanity at the time of the commission of the crime involves a fact affecting the guilt or the innocence of the accused and necessarily it must be tried on the merits and submitted to the jury the same as all other facts presented during the trial of the case. See State v. Eisenhardt, 185 La. 308, 345, 349, 169 So. 417; State v. Sample, 203 La. 841, 14 So.2d 678."

Defense counsel's further contention that the law of Louisiana is outmoded and archaic and should be changed in accordance with the test of legal insanity prevailing in some other jurisdictions [10] is beyond the scope of this appeal and presents a matter that should be addressed to the legislature.

While this court is without appellate jurisdiction as to the facts in criminal cases,[11] nevertheless after reading the entire testimony, as previously pointed out in connection with Bill No. 1, we think that the trial judge properly denied defendant's motion for a new trial.

For the reasons assigned, the conviction and sentence are affirmed.

10. The "right and wrong test" adopted in this state is the generally accepted test in the majority of American jurisdictions. 14 Am.Jur. 796, Verbo "Criminal Law", § 40.

11. Art. VII, § 10(7), La.Constitution of 1921.