211 So.2d 261

STATE of Louisiana

v.

Terrance MARKS, Jr.

No. 48998.

June 4, 1968.

Rehearing Denied June 28, 1968.

Ernest C. Hunt, Jr., Max M. Morris, Lake Charles, for appellant.

Jack P. F. Gremillion, Atty. Gen., William P. Schuler, Asst. Atty. Gen., Frank T. Salter, Jr., Dist. Atty., J. B. Jones, Jr., Asst. Dist. Atty., for appellee.

FOURNET, Chief Justice.

The defendant, Terrance Marks, Jr., having been convicted and sentenced to be electrocuted on an indictment charging him with aggravated rape prosecutes this appeal, relying for the reversal thereof on seven alleged errors committed during the course of the trial to which objections were made and bills timely reserved and perfected.[1]

---

1. Counsel reserved numerous bills of exception during the course of the trial and as pointed out in his brief perfected only those bills which he deemed meritorious.

■ The first bill of exception was reserved when the trial judge ruled, following a hearing to determine defendant's present mental condition,[2] that defendant being able to understand the nature of the proceedings against him and to assist his counsel, was sane. The basis upon which this bill is predicated is as stated in the bill "that the members of the lunacy commission had spent insufficient time in examining the defendant, never gave the defendant any physical examination, nor did any of them make or cause to be made any tests * * * to determine the presence of any lesions of the brain or other conditions, * * *; nor did the Lunacy Commission adequately inquire into the background of the defendant so as to have a proper history on which to base any opinion as to present sanity; further, neither the Lunacy Commission nor the court applied the proper standard, tests or rule in determining what constitutes present sanity."

There is clearly no merit to his bill. The evidence adduced at the hearing unquestionably supports the conclusion of the trial judge as stated in his per curiam that the evidence established as a fact that the defendant was mentally competent and presently sane under the laws of this state. The uncontradicted testimony of Drs. White and Funk is that each individually examined the accused nearly two hours and in conjunction with the report they had received from Dr. Charles Downing, who had administered certain psychological tests to the accused, they were of the opinion that the defendant was able to understand the proceedings against him and to assist his counsel. In fact, a mere reading of defendant's testimony in the case will readily disclose that it is most convincing that he fully understood the proceedings and was well able to assist his counsel—his answer to questions propounded to him were answered in a clear and rational manner.

■ Under the law it is presumed that every man is sane; (State v. Seminary, 165 La. 67, 115 So. 370; State v. Toon, 172 La. 631, 135 So. 7; State v. Riviere, 225 La. 114, 72 So.2d 316) and the burden is on the accused to establish by a clear preponderance of the evidence that he is so mentally deficient that he lacks capacity to understand the nature and object of the proceedings against him and to assist in

2. Following the motion by counsel for defendant, the court appointed a lunacy commission composed of Dr. Charles White and Dr. Barclay Funk to inquire into the present sanity of the defendant and his sanity at the time of the commission of the alleged offense. They reported, "That Terrance Marks, Jr. is presently mentally competent; that he was mentally competent at the time of the commission of the alleged act for which he is charged; that he does fully understand the natural, probable and usual consequence of his acts and is able to adequately assist his counsel in the defense of his case."

conducting of his defense in a rational manner. State v. Bailey, 233 La. 40, 96 So. 2d 34; State v. Riviere, supra; State v. Eubanks, 240 La. 552, 124 So.2d 543; State v. Mack, 243 La. 369, 144 So.2d 363, cert. denied, 373 U.S. 917, 83 S.Ct. 1306, 10 L.Ed. 2d 416.

■ Counsel's contention, both orally and in brief, that the law of this state to test the defendant's sanity at the time of the commission of the act,[3] is antiquated and his suggestion that the court should test defendant's sanity at the time of the commission of the act in light of those rules laid down in United States v. Freeman, 2 Cir., 357 F.2d 606, known as irresistible impulse, lacks merit. Counsel urged no objection to that part of the report of the lunacy commission that the accused "was mentally competent at the time of the alleged act for which he was charged", nor was not guilty by reason of insanity an issue in the case as no such plea was made.

The second bill of exception was reserved upon the refusal of the trial judge to grant, after a hearing, defendant's three motions to quash the indictment,[4] which were based primarily on the contention that the grand jury and general venire list were illegally

3. R.S. 14:14 provides, "If the circumstances indicate that because of a mental disease or mental defect the offender was incapable of distinguishing between right and wrong with reference to the conduct in question the offender shall be exempt from criminal responsibility."

and unconstitutionally appointed in that (1) there has never been in the history of Calcasieu Parish a Negro Jury Commissioner; (2) the grand juries were not chosen by the duly appointed Jury Commission as a whole, but the jurymen from a particular ward were chosen by the jury commissioner representing that particular ward without knowledge, consent or approval of the other members of the jury commission; (3) there was exclusion of certain classes of persons from the venire list which included those who could claim an exemption by reason of their occupation and those persons with a "criminal record."

■ The contention that the indictment should have been quashed because no member of the Negro race was serving on the jury commission that selected the general venire from which the grand jury that indicted the defendant was drawn was adversely decided to defendant's contention by this court in the case of State v. Barksdale, 247 La. 198, 170 So.2d 374, and also by the Supreme Court of Arkansas in Stewart v. State, 237 Ark. 748, 375 S.W.2d 804. The United States Supreme Court denied certiorari in the latter case, 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed.2d 345.

4. After defense counsel filed a motion to quash the indictment, he filed two supplemental and amending motions to quash.

▌ The second ground on which the motion to quash is based is equally without merit for as provided by R.S. 15:203, "It shall not be sufficient cause to challenge the venire selected for any session of the court or portion thereof for service at any time in any parish or district of this state, or to set aside the venire, because some of the jurors on the list are not qualified to act, nor because of any other defect or irregularity in the manner of selecting the jury, or in the composition, summoning or proceedings of the jury commission, *unless some fraud has been practiced or some great wrong committed that would work irreparable injury; * * *"* (Emphasis added.) See, State v. Foster, 32 La.Ann. 34; State v. Aspara, 113 La. 940, 37 So. 883; State v. Brantley, 175 La. 192, 143 So. 46; State v. Bussa, 176 La. 87, 145 So. 276; State v. Murphy, 234 La. 909, 102 So.2d 61, cert. denied, 357 U.S. 930, 78 S.Ct. 1376, 2 L.Ed. 1373; State v. Jenkins, 236 La. 256, 107 So.2d 632. Herein the motion contains no allegation of fraud, nor is there any showing that a great wrong working irreparable injury has been committed. As was pointed out by the trial judge in his per curiam there was an agreement among the jury commissioners that the method they used in preparing the general venire list was to be the action of the jury commission as a whole and he found the general venire list was the result of their combined efforts and approved by them as a whole, even though names thereon were furnished by individual members from their respective wards. Commenting further the judge stated, "It is evident that they have tried their best to select as fair and impartial jury panels as could possibly be had. They try to select people from throughout the whole parish in order to get a cross section of the community. There is no evidence in this record which would even indicate that there was any wrong committed or that this defendant would in any way be prejudiced by the system that was used."

▌ The third ground urged by defendant in support of his motion to quash, i. e., the exclusion of certain classes of persons from the venire list by reason of their occupation, was adversely adjudicated to his cause by this court in State v. Clifton, 249 La. 495, 172 So.2d 657. In that case the court very aptly observed, "* * * Even with the exclusion of persons entitled to exemptions in the case at bar, there remained a sufficient number of qualified jurors from an adequate cross section of the parish to insure a fair and impartial trial of the accused without any evidence of discrimination against the class to which he belonged. There is nothing to indicate that inclusion of any of the exempted categories might have altered the jury verdict."

The trial judge in his per curiam on this point relied upon the case of State v.

Clifton, supra, pointing out that the case relied upon by defendant, State v. Goree, 242 La. 886, 139 So.2d 531, was inapposite factually and found in the present case that nothing indicated the defendant belonged to the class excluded. It was found the evidence reflected that there were many Negroes on the petit and grand juries in the parish, and, in fact, included in the grand jury which rendered the indictment in this case.

■ As to the fact that to some extent persons with criminal record were not included on the jury list the judge properly maintained the jury commissioners were simply applying the law adopted by the legislature, to the effect that the jurors be persons of well known good character and standing in the community, and, in addition, the defendant cannot complain of systematic exclusion of persons of a particular category unless he happens to be in that category and there is no evidence that the defendant is a person that would fall in that category. The United States Supreme Court observed in Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043, "This court * * * has never entertained a defendant's objection to the exclusion from the jury except when he was a member of the excluded class."

■ Bill of Exception No. 3 was reserved when the trial judge overruled defendant's motion for a mistrial based upon the contention the remark of the trial judge during the voir dire examination but before any juror was selected to the effect that counsel for defendant was "court appointed" was prejudicial to defendant's cause.

Counsel's argument in his brief in support of the bill that the inference would be drawn by the prospective jurors that if there had been any merit to the defendant's case he would have retained an attorney of his choice and that those appointed were to fulfill a mere formality, lacks substance. We agree with the trial judge's observation in his reasons assigned at the time of his ruling that he was unable to perceive that any prejudice might result from the remark but, nevertheless, promptly, admonished the members of the jury within the hearing of his voice at the time to disregard the statements he had made, thus curing the irregularities, if it may be said to have been such.

■ Bill of Exception No. 4 was reserved when the trial judge overruled the defendant's motion to excuse Henry Dumatrait for cause as he had previously served as an alternate juror in State v. Rideau. In support of this bill counsel argues, both orally and in brief, that the fact that this man was called again reflects there is something inherently wrong with the jury selection method, and, further, his presence in the Rideau case could not help but have

had some subconscious psychological effect on his feelings and participation in the case at hand.

We find nothing in this bill of any merit. As observed by the trial judge, "This court knows of no legal basis for the challenge for cause urged by defendant." It does not form the basis for a challenge for cause enumerated in C.C.P. Article 797, and, there is absolutely no showing that the juror was not in anyway impartial in regard to the instant case. His testimony discloses that upon conclusion of the trial of the Rideau case as an alternate juror he was dismissed and accordingly left the court and in no way participated in the verdict, hence, we fail to see how this could have any prejudicial effect on his ability to serve in an entirely unrelated case.

The fifth bill of exception was reserved to the refusal of that portion of the motion to suppress the evidence relative to the admission of defendant's statements or confessions on the ground that the state failed to establish that they were given freely and voluntarily; that defendant, at the time said statements were given, was not properly advised by the interrogating officers of his right to have his mother present, being 16 years old at the time, nor was he properly advised of his constitutional rights (a) to remain silent and any statement he would voluntarily make could be used against him in the event of prosecution, (b) to have counsel present when interrogated or prior to being placed in a lineup, and (c) if he was unable to hire an attorney one would be furnished him by the parish.

The trial judge in disposing of this bill of exception concluded from the evidence that defendant was fully advised of his constitutional rights prior to taking any statements from him and was satisfied defendant was sufficiently intelligent to know his rights and to understand the explanation of his rights under the law which as shown by the evidence in the case to have been made to him; and the statements were freely and voluntarily given.

A perusal of the testimony given at the hearing on this motion clearly supports the conclusion of the trial judge. At the hearing on the motion to suppress the defendant testified he had a tenth grade education and he answered the questions propounded to him clearly and intelligently, admitting he fully understood the import of all that transpired during the hearing, and that he was made no promises, inducements or threats or placed in fear. He also admitted his confession as detailed in footnote 5, infra, was correct as to the facts therein. The record further discloses that while the defendant was being detained as a suspect in the city jail shortly after the commission of the offense Captain Stroh, who had been called in, noticing what appeared to be a streak of blood on his face and under his fingernails and smears on his trousers, im-

mediately apprised him of his constitutional rights (a) to remain silent and that anything he voluntarily said could be used against him; (b) to have the presence of counsel during interrogation; and (c) that if he was unable to afford an attorney one would be appointed for him by the parish, and shortly thereafter defendant was turned over to the sheriff's department where he was booked and dressed in the customary coveralls. At 12:50 he was placed in a lineup with four others and identified by the victim and was so informed, whereupon he was taken to St. Patrick's Hospital where blood scrapings were removed from underneath his fingernails and from his face and then at 1:30 returned to jail to be fingerprinted and photographed. From there he was turned over for interrogation to Deputy Sheriffs Mancuso and Boyd who testified unequivocally that they fully advised the accused of his constitutional rights to remain silent and that anything he said could be used against him, to have the presence of counsel during interrogation, and that if he was unable to afford an attorney one would be furnished him by the parish, to which he responded he did not want an attorney, all he wanted was that his mother be notified where he was. Almost immediately thereafter he voluntarily admitted the offense in detail,[5] during which he related he had placed the knife he had threatened the victim with in the kitchen drawer at his home with the other kitchen knives and had placed the money from a purse he had taken from the victim's home in his dresser drawer. The deputies then secured a search warrant from the district judge, and, accompanied by the accused went to his home where they secured the money and the knife, and at that time informed his mother of the charges against him. Upon returning to the jail the defendant then agreed to and did reduce the statement to writing which

5. Defendant stated that he had been riding around town on his bicycle when he observed a lady in a nightgown through the open window of her home shooting pool, and after riding on for a few blocks, returned to the house finding it in darkness. He went to the back of the house, finding the rear door unlocked; he entered the house proceeding through the room with the pool table, then to the next room where he found children sleeping and then to the room where he saw a baby and the lady sleeping. The latter awakened and began to scream when he disconnected the lamp cord, whereupon he placed his hand over her mouth and threatened her with the knife he removed from his belt. As she reached for the telephone he began to hit and threaten her with the knife, holding it against her as he raped her. As he left he took her purse from the dresser and ran out of the house to his bicycle and proceeded home, allegedly dropping the purse in the street when he was accosted by some white boys. At home he placed the knife in the drawer with other kitchen knives and placed some money he had taken from the purse in his dresser drawer, proceeding then to a nearby bar where he had been at the time the city police officers picked him up and brought him to the city jail for interrogation.

was taken at 3:00 A.M., read and signed by him in the presence of Deputies Mancuso and Boyd and Captain Stroh. Around noon that day the defendant made a second written statement, when confronted with the fact that the city police had found the missing purse behind a vacant house, admitting he had not lost the purse in the street as he had previously stated but had placed it by the vacant house in hopes of returning in the daylight to re-examine the contents further,[6] and accordingly made the statement to this effect.

▰▰ Nevertheless, counsel argues strenuously that there was a denial of his constitutional rights when he was placed in a lineup without being advised of his rights and the fact "that the defendant confessed prior to having occasion to talk to his mother, even though it appears clear that he asked the officers numerous times to notify his mother * * * is sufficient to destroy the voluntariness of the confessions given." Counsel relies on United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, in support of the first proposition and Application of Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527, for the second.

▰▰ We find these cases have no application to the case at bar. On the day the Wade case was handed down Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed. 2d 1199, was also handed down by the United States Supreme Court and observed the rule in the Wade case of the right to counsel at a post-indictment lineup was not to be applied retroactively. It would be applied only in cases in which the trial began after that date, June 12, 1967, and the trial herein was commenced on that date. The Gault case is not only inapposite from a factual standpoint since the child's parents therein had not been given sufficient notice before the hearing of the charges and neither the juvenile nor his parents were advised of the right to counsel, the court in that case observed that the opinion was in regard to proceedings by which a determination is made as to delinquency of a juvenile and declared it was not to consider "the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state." Moreover, the defendant, as previously shown, was fully advised of his rights in accordance with the guidelines laid down in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. He was intelligent and sufficiently educated to understand these rights and unequivocally stated at repeated stages that he did not want an attorney, all he wanted was that his mother

6. Defendant stated he had removed $13.00 from the purse and about $1.00 in change. When the purse was found by the city police $200 in a bank folder was found still in the bottom of the purse.

be notified where he was. The record unmistakeably shows that he freely and without protest appeared in the lineup with four other Negro males similarly dressed in prison garb, after being fully informed of this proceeding and its purpose. Although his mother denied that she was informed of her son's whereabouts until 5:00 A.M. on the morning after the commission of the offense, her testimony is impeached by the evidence in the record. Not only did the officers positively testify that she was informed when they came to the house at approximately 2:30 A.M. to serve the search warrant, accompanied by her son, who picked out the knife from the drawer that he had used in commission of the offense for which he was being interrogated, but the record established that the search was fully ½ hour before the written confession was given. In any event, she did not go see him, or send anyone, until the second visiting day a week later, claiming she was ill before. Moreover, it is apt to observe the defendant's step-father, Anderson Hubbard, who was present during the search, was never called as a witness at the hearing on the motion to suppress.

■ The next bill was reserved when the trial judge overruled defendant's objection to admission of certain state exhibits, S9 through S20 which included the clothing of the defendant and victim on the night of the offense, the bed sheets, the knife and various other articles secured from the victim's bedroom, on the ground that the state failed to show a complete and uninterrputed chain of possession and control of the exhibits.

We think a review of the testimony taken in connection with this bill clearly supports the trial judge's conclusion as reflected by his per curiam that the chain of possession and control was sufficiently established to fully identify the exhibits. The bill is therefore without merit.

The last bill was reserved when the trial judge overruled defendant's motion for a new trial based on the allegation that defendant was aggrieved by the rulings to which bills of exception were reserved and in allowing the introduction of the confession of defendant and various exhibits during the trial, and thus presents nothing new for our consideration as disposed of hereinabove.

For the reasons assigned the conviction and sentence are affirmed.

BARHAM, J., dissents with written reasons.

BARHAM, Justice (dissenting).

The majority has found no merit in any of the seven bills of exception upon which the defendant Terrance Marks, Jr., relies for reversal of his conviction. Since I have concluded that Bill of Exception No. 2 has merit, I must dissent from the conclusion of the majority as to this bill.

Bill No. 2 was reserved upon the refusal of the trial court to grant a motion to quash the indictment. Several allegations of error are raised in the motion to quash and in the bill reserved to its overruling, but the contention in which I find merit is that the jury commissioners did not follow the statutory requirements of former LSA-R.S. 15:179 and 15:188 in compiling the general venire and drawing the grand jury therefrom.

On May 13, 1966, an order of the Fourteenth Judicial District Court assigned June 20 as the beginning of a grand jury term for Calcasieu Parish, and instructed the jury commission to proceed to draw the grand jurors. On May 24 the jury commission met and purported to supplement the general venire box to 30 names and to draw 20 names for the grand jury for that session. It was this grand jury which indicated the defendant for aggravated rape.

At a hearing on the motion to quash the indictment the defendant called all five jury commissioners and the clerk of court to testify to their proceedings in compiling the general venire list of 300 and in drawing the 20 names for the grand jury. The testimony of these six witnesses, which is not at variance except in minute particulars, may be summed up as follows:

When the jury commission met in the office provided by the clerk of court, the clerk or his staff submitted to the commissioners the total number of veniremen to be drawn to complete the general venire and an allocation of the specific number of veniremen to be drawn from each ward in the parish. The formula for this allocation had been an exclusive determination by the clerk of court. The clerk alone assigned the number of veniremen to be drawn from a particular ward on the basis of the ratio of population or registered voters and the depletion of potential jurors from that ward by previous drawings from the general venire box or other deletions. If Ward 1, for instance, was entitled under the constructed ratio to furnish a total of 25 names in the general venire box and seven of those names had been pulled for service or deleted for other reasons, there would then be allotted to Ward 1 seven names to be selected and placed in the general venire box. The five jury commissioners did not participate in any of the above determination and had little if any knowledge of its origin or basis.

The clerk of court kept a card index by wards of names of potential jurors for the entire parish. This master list was created exclusively by the clerk of court without contribution from the jury commissioners, and some of the jury commissioners did not even know the sources from which the list was compiled. The clerk testified that the card file was drawn pri-

marily from the voter registration rolls, but that he and his staff supplemented it from other lists and other sources from time to time.

When the jury commissioners arrived at the meeting, the list of names remaining in the general venire box was read so that there would be no duplication in their compilation of the general venire list. Each of the five commissioners had the exclusive assignment of one or more wards in Calcasieu Parish for the purpose of determining the names to be chosen for the general venire box. Each commissioner was supplied by the clerk with the number of veniremen to be selected for his ward and the list from which to select them. For example, Commissioner Robert Perry Hennigan had the exclusive responsibility of choosing the names for the general venire list from Wards 5 and 6 of Calcasieu Parish, and when he arrived at the meeting, the clerk informed him in writing how many names were needed from Wards 5 and 6 and supplied him with the list from which to draw those names.

Each of the five jury commissioners testified that he was responsible for the selection of the names for the general venire only from the particular ward or wards assigned to him. Mr. Hennigan was responsible for choosing the names for the general venire from Wards 5 and 6, Mr. Kinny from Wards 4 and 7, Mr. Love and

Mr. Dufrene from Ward 3, and Mr. Derouen from Wards 1, 2, and 8.

The clerk, Mr. Hillebrandt, testified that 110 names remained on the general venire list when they began the selection of this particular grand jury. Thus these five jury commissioners were required to select 190 names allocated by wards according to the formula determined by the clerk before the meeting. In short, each commissioner chose the names for his ward or wards and was limited in the selection of the names by the cards presented to him by the clerk, who had compiled them from sources known only to himself.

The names selected were given to a member of the clerk of court's staff to be typed upon slips, and these slips were then dropped into the general venire box. The jury commissioners did not discuss with each other the names they were selecting for the general venire. The final or general venire list was not read by or to the full jury commission. There was no action or consideration in common. There was no exercise of approval or rejection of the complete general venire list by the commissioners.

At the conclusion of the meeting the jury commissioners signed a proces verbal in blank. The indication is that nothing was included in the proces verbal at that time except the 110 names which had remained in the general venire box from pre-

vious drawings. Twenty names had been drawn from the new general venire box for service on the grand jury, but they were not set forth in the proces verbal. The full 300 names from which the 20 grand jurors were drawn were not in the proces verbal signed by the jury commissioners.

The jury commissioners did not as a group or individually have any knowledge of the total makeup of the general venire. They had not at any time acted in concert. They had approved by their signatures a partially blank, therefore false, proces verbal. They had been limited in the selection of the members of the general venire to the names on a list prepared by the clerk of court from sources not fully disclosed. They had been limited in the selection of the members of the venire by a formula prescribed by the clerk of court and not prepared by them. Each was required to select prospective jurors only from certain wards, and did not exercise any control over the selection of veniremen from other wards.

The facts set out above are not controverted or at variance. The question presented for resolution is whether this conduct by the jury commission in the selection of the general venire, and of the grand jury which eventually indicted the defendant, was so illegal that the motion to quash the indictment should have been sustained.

For an answer to this question it is necessary to consider former LSA-R.S. 15:179, 15:180, 15:188, and 15:203, as follows:

"§ 179. At the time ordered by the district judge, the *jury commission shall meet* at the office of the clerk of the district court and, in the presence of two or more witnesses, *shall select* from the persons qualified to serve as jurors for their respective parishes three hundred persons, a list of whom shall be made out by the clerk *under the supervision of the commission and said witnesses.* This list shall be the general venire list and shall be kept complete and supplemented from time to time as hereinafter enacted. \* \* \*" (Emphasis here and elsewhere has been supplied.)

"§ 180. Immediately after completing the general venire list, *the commission shall select* therefrom the names of twenty citizens, \* \* \* who shall be subject to duty as grand jurors \* \* \*."

"§ 188. Not less than once in every six months, computing the time from the date of the first drawing by the jury commission, the *jury commission shall meet* at the clerk's office and after being furnished by the clerk with a list of those who have served as regular jurors since the previous drawing of the general venire, *shall* in the presence of not less than two witnesses, *examine* the original venire list and strike there-

from and take from the general venire box the names of those who have served, who are known to have died, removed from the parish, become exempt or disqualified to serve as jurors, since their names were entered on the list. *The commission shall then supplement* the original list and the slips in the box with the names of the same number of good and competent men from the qualified jurors of the parish, as have been taken from the box and erased from the list, so as to keep the number of names in the general venire box and on the jury list at the original standard of three hundred. *The clerk* of the district court *at each meeting of the commission shall make a proces verbal of its acts in detail* and record the same in a book to be provided for the purpose by the police jury, which shall at all times be open to the inspection of the public. *Said proces verbal shall be signed by the clerk of court, the members of the commission present and the witnesses."*

"§ 203. It shall not be sufficient cause to challenge the venire selected for any session of the court or portion thereof or for service at any time in any parish or district of this state, or to set aside the venire, because some of the jurors on the list are not qualified to act, nor because of any other defect or irregularity in the manner of selecting the jury, or in the composition, summoning or proceedings of the jury commission, unless some fraud has been practiced or some great wrong committed that would work irreparable injury; provided, that it shall be good grounds to challenge, for cause, any juror who is not qualified by law to act."

State v. Sheppard, 115 La. 942, 40 So. 363 (1906); State v. Clifton, 247 La. 495, 172 So.2d 657 (1965), and former LSA–R.S. 15:203 are relied upon by the State as authority for holding that the actions by the jury commission were mere irregularities and therefore not factual to the general venire or the indictment.

In the Sheppard case a lawyer who had a large practice before the court suggested certain names to the jury commission. That body finally though tardily objected, and the interference terminated. Sheppard was decided under Act 135 of 1898, Section 15, which corresponds to former LSA-R.S. 15:203. The court held that the conduct was merely irregular, and that there was no fraud or great wrong committed by the jury commissioners to injure the defendant in any way. The court stated that the statute (Section 15 of Act 135 of 1898) should not be considered mandatory in all of its details.

In State v. Clifton, supra, decided almost 60 years later, the jury commissioners in advance of their meeting prepared lists of those they intended to sug-

gest for inclusion on the general venire. The lists were submitted to the clerk of court, who checked the names thereon against a card index file maintained in his office to ascertain whether these persons were unable to read and write, had any physical infirmity, or were otherwise disqualified to serve as jurors. A comprehensive list was then typed in advance of the meeting. When the official meeting was held, the commissioners and the clerk of court, acting as a body and in the presence of witnesses, went over the master list to determine whether the persons were qualified and to make any additions, deletions, or other changes they considered necessary. After eliminating persons not qualified and supplementing the master list, the commission approved and compiled a general venire list. The court said:

"The method employed by the individual jury commissioners in preparing their lists in advance may, upon the first impression, appear to be a departure from the *obvious intendment* of LSA-R.S. 15:179, *requiring that there be supervision and common deliberation by the jury commissioners as a body over the names composing the general venire list. * * * The final list, then, was made under their supervision* after common deliberation regardless of the plans and preparations which preceded the meeting. There was, therefore, a *substantial compliance* with the requirement

of LSA-R.S. 15:179 that at the time of the meeting the jury commission shall select from the persons qualified to serve as jurors three hundred persons, a list of whom shall be made under the supervision of the commission.

"Even if the practice outlined is considered technically irregular, it is not such an irregularity that the proceedings of the jury commission must be invalidated. For appellant's contention that the quoted portion of LSA-R.S. 15:179 is mandatory in all its details is not supported by the law of this State. To the contrary, a variation from the strict letter of this law does not permit the composition of a grand or petit jury to be set aside because of insignificant technicalities or irregularities, unless there is a showing that some fraud has been practiced or great wrong committed which would work irreparable injury to the accused. [Citations omitted.] * *"

Having concluded that there was substantial compliance and the absence of fraud or irreparable injury, the court in Clifton refused to quash the indictment. In State v. Sturgeon, 127 La. 459, 53 So. 703, 704 (1910), the court stated:

"It must be borne in mind, where there is *substantial compliance* with the statute, unless there is fraud practiced or wrong inflicted, irregularities are not fatal to the legality of the general venire or the indictment. State v. Sheppard * * *."

State v. Clifton, supra, states the law of Louisiana under the former Revised Statutes which are applicable to the case at hand. The court in that case was very careful to define the circumstances complained of and to delineate the reasons for holding the jury commissioners' acts as "mere irregularities". The court in Clifton recognized that our law requires common deliberation and concerted action by the jury commission in the selection of the general venire, and it found substantial compliance with this requirement. It held that because there was substantial compliance, the practice complained of was a technical irregularity. In the Clifton case not only was there a failure to show fraud, but there was a complete absence of a possibility of fraud because of common deliberation and compilation of the venire before witnesses.

To the contrary, in the instant case, even without a showing of actual fraud, the conduct of the jury commission, which was in complete and direct violation of the statute, created such opportunities for fraud and great wrong that a showing of actual fraud is not necessary. These practices were not "mere irregularities"; they were a total disregard for and pretermission of regularities. There was absence of any regularity or compliance with the requirements of the law. The purpose of a jury commission was defeated. The absolute requirement of public selection before witnesses not only was derogated but was in fact nullified by such practices. What purpose did witnesses serve when they were denied access to the names of the general venire and were required to sign an incomplete proces verbal? State v. Feazell, 114 La. 533, 38 So. 444 (1905). Without imputation of fraud to these well-intentioned commission members, such misfeasance and non-feasance constitute constructive fraud.

Under our Constitution and statutes no one man, not even a district attorney, can initiate the prosecution for a capital offense, yet the practices of this jury commission made it entirely possible for the defendant to stand trial for a capital offense after indictment by a grand jury selected by a single commissioner. Only 20 men were named for the grand jury from the 300-man list. It can be assumed that each of the jury commissioners had selected *individually, without assent* from the other commissioners, at least 20 names on the general venire list. Therefore the grand jury which indicted the defendant could have been composed of persons chosen by the independent selection of any one of the five commissioners. Certainly the grand jury which indicted the defendant was not selected by these five men from a venire compiled after common deliberation. The conduct here is fraught with danger and possibility of fraud, and is more than a mere irregularity.

Finally, it must be concluded that the prospective veniremen were selected by the clerk, and that only a second or more definitive selection was made by the jury commissioners. This is also fraught with grave danger. I do not impute wrongdoing to the clerk of court, but to vest this authority in him is to reject the need for a jury commission. See State v. Newhouse, 29 La.Ann. 824 (1877), wherein the court rejected the inspection and approval by the jury commission of a "cut and dried" list. There is no need to show prejudice in the face of an irregularity of this kind. *The complete lack of any regularity or compliance is such a great wrong per se that this court would be irrational to burden the defendant with the onus of proving fraud or specific irreparable injury.*

The constitutional guarantee that one may be tried for a capital offense only upon indictment by grand jury is made meaningful by the statutes which describe and prescribe the manner for the selection of that grand jury. To give such strength and effect to former LSA-R.S. 15:203 as to strike down all of the statutory requirements for the selection of the general venire and the grand jury would, in effect, deny the right to indictment by grand jury, as understood by the framers of our Constitution, our lawmakers, and our courts. This court should not interpret one statute so as to read out and make inoperative two other statutes of equal value within the same title.

Our jurisprudence by comparative statutory analysis has correctly declared that compliance with each and every detail of former LSA-R.S. 15:179 and 15:188 is not mandatory. Sheppard and Clifton, however, indicate the limits ("substantial compliance"), and are not authority for plunging this construction and interpretation into the abysmal void of statutory eradication and obsolescence. I believe that these statutes are meaningful and effective, and that total disregard of and non-compliance with their terms and intendment are fatal.

The conduct of the jury commissioners here was completely irregular and illegal. It deprived the defendant of the constitutional guarantee not to be tried for a capital offense except upon indictment by a grand jury as defined and intended by Constitution, statutes, jurisprudence, and history. To hold to the contrary is to extend the right but to veritably cancel and withdraw the naturally ensuing privilege and protection.

Having concluded that the motion to quash the indictment should have been maintained, I express no opinion as to the other bills of exception.

I respectfully dissent.

BARHAM, J., is of the opinion a rehearing should be granted.