248 So.2d 324

STATE of Louisiana

v.

James Willie MILLSAP.

No. 50797.

May 4, 1971.

Rehearing Denied June 7, 1971.

Kidd & McLeod, Paul Henry Kidd, Monroe, for plaintiff-appellant.

Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Robert W. Kostelka, Dist. Atty., for defendant-appellee.

SUMMERS, Justice.

James Willie Millsap was jointly indicted with George A. Square for the murder of Mrs. Ezell Jordan. A severance was granted, and they were separately tried. In a trial in which Millsap appeared as a witness for the State, Square was convicted and the death·penalty was imposed. We affirmed that conviction. State v. Square, 244 So.2d 200 (La.1971). In this separate trial of Millsap a verdict of guilty without capital punishment was entered, and he was sentenced to life imprisonment.

The victim, Mrs. Ezell Jordan, was 58 years of age. She was employed as a practical nurse at a nursing home in West Monroe, Ouachita Parish. About 4:30 or 5 o'clock on Saturday morning, April 13, 1968, she left her home for work driving a white Falcon automobile. When she did not arrive for work at the usual time, the Sheriff's Office was advised of her disappearance. An intensive search resulted in the discovery of her body about 6:45 that evening in the trunk of her automobile which was found between the levee and the river at the end of Lazarre Street in West Monroe.

The victim's body revealed several stab wounds, though there was little blood in the car trunk. Grass fragments were present in her wet clothing. These facts suggested to the investigating officers that the fatal wounds had been inflicted outside the car trunk, and that the body had been dragged from the water at the river's edge across the grassy levee to the car. Because Mrs. Jordan was a large woman, the investigating officers theorized that at least two persons were required to lift the body into the car trunk.

A number of papers and other belongings of the victim were found at the scene, principally her checkbook. The name "John Thomas Roy" was written on one of the checks in the victim's handwriting. Officers immediately checked on Roy's whereabouts and learned that he was, and had been for some time, incarcerated in the state penitentiary. With this knowledge, they began inquiries to learn who Roy's friends or associates were. By questioning Roy's relatives, and on the basis of their own recollection that Roy and George A. Square had served time together on a pre-

'vious conviction, it became apparent to the officers that Square would be likely to use Roy's name. Square was taken into custody.

Meanwhile a 1961 blue Ford was reported abandoned in another area of the parish. When the car was brought in, it was noted that fender damage and paint smears on the Ford and on the victim's Falcon indicated the vehicles had collided. Another significant link in the chain of evidence occurred when Dan Slakter, manager of Kirchoff's clothing store, reported to the Sheriff's Office on Sunday, April 14, that two Negro males had come to his store the previous day to cash a personalized check of Mrs. Ezell Jordan, but he refused to accommodate them. Slakter was prompted to report this incident by the news of Mrs. Jordan's murder in the newspapers and on television.

Interrogation of Square and two of his known companions, Modicue and Broussard, satisfied officers that Modicue and Broussard were not involved in the crime. Inconsistencies in Square's story, and discovery of a blood-stained coat in his home, as a result of a search with a search warrant, convinced the officers that Square should be held in custody, and the investigation should proceed on the basis that an accomplice was involved.

While these events were transpiring, Officer Fred Davis recalled that during his patrol on the night of April 12 and the early morning of April 13 he saw Square and Millsap together at the "tin building", a bar in West Monroe owned and operated by Hudson Johnson. Questioning of Johnson and others who were present at the time confirmed Davis' recollection.

With this information the officers returned to the Sheriff's Office and, by reference to their files, ascertained that Millsap lived not far away in Union Parish. On Monday, April 15, the Union Parish Sheriff's Office was contacted and requested to send a deputy to a rendezvous point near Millsap's home. The officers met and proceeded to Millsap's house where he was arrested.

After Millsap was placed in the police car, he was given the Miranda warnings by one of the officers. Thereafter, while on the way to the Sheriff's Office, he made certain inculpatory statements. Some time after arrival at the Sheriff's Office Millsap agreed to record a statement, and at that time he signed a written waiver of counsel acknowledging that he received the Miranda warnings. Two days later he gave a second recorded statement and signed another written waiver of counsel acknowledging that he had been informed of his constitutional rights as required by the Miranda decision. (See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 [1966]). These statements gave a detailed account of both Square and Millsap's activities and established their joint partici-

pation in the crime—Millsap denying only that he inflicted any wound which caused the victim's death.

After his arrest Millsap's fingerprints were found to match fingerprints taken from the rear-view mirror of the 1961 blue Ford. There were no known records of Millsap's fingerprints prior to his arrest.

Developing a lead suggested by the information furnished by Dan Slakter that two Negro males tried to cash Mrs. Jordan's personalized check, and information contained in Millsap's statements that the check was torn and thrown away after he and Square left Kirchoff's Department Store, one of the officers undertook a careful search of the area and found a piece of the check in a nearby parking lot.

Prior to trial, defense counsel filed a motion to suppress the three statements made by Millsap to the Sheriff's Deputies, the comparison of Millsap's fingerprints with the print found on the 1961 blue Ford, and the piece of Mrs. Jordan's personalized check found in the parking lot.

After trial of the motion at which the facts recited above were established, the trial court refused to suppress the evidence, and Bill of Exceptions No. 1 was reserved. Thereafter the evidence was received at Millsap's trial on behalf of the prosecution.

Defense counsel contends the evidence should have been suppressed because it was obtained as a result of an illegal arrest without a warrant and without *probable cause*. It is contended also that, prior to making the statements to the Sheriff's Deputies, Millsap did not understand the nature of the warning, and hence his waiver of the right to counsel and the right to the Miranda warnings was not an intelligent waiver.

Conceding the arrest of Millsap was without a warrant, the State's attorney contends the arrest was nevertheless valid, for the peace officers who arrested him had *reasonable cause to believe* that the person to be arrested had committed an offense although not in the presence of the officers. Such an arrest is considered valid under Article 213(3) of the Code of Criminal Procedure.[1]

█ In State v. Johnson, 249 La. 950, 964, 192 So.2d 135, 140 (1966), we discussed this issue in light of Article 60 of the Code of Criminal Procedure in effect at that time. Since revision of the Code, Article 213(3) applies. But the meaning of the term *reasonable cause to believe* has not changed. Reasonable cause to believe—or "probable cause" as it is termed under the federal standard—to make an ar-

---

1. La.Code Crim.P. art. 213(3):
    "A peace officer may, without a warrant, arrest a person when:
    &ast; &ast; &ast; &ast; &ast;

"(3) The peace officer has reasonable cause to believe that the person to be arrested has committed an offense although not in the presence of the officer; or
&ast; &ast; &ast; &ast; &ast;"

rest, without a warrant, exists when the facts and circumstances within the arresting officer's knowledge, and of which he has reasonable, trustworthy information, are sufficient in themselves to justify a man of average caution in the belief that an offense has been or is being committed.

Compliance with these standards is, in the first instance, a substantive determination to be made by the trial court from the facts and circumstances of the case.

And in determining compliance with these standards it is not the proof required for conviction which is relevant. Proof required to satisfy the requirement of reasonable cause to believe, or probable cause, is less and is what the terms imply: probabilities and practical considerations of everyday life on which reasonable men could reasonably be expected to act.

In such cases, because only factual issues are presented by the contentions, the setting in which the arrests took place becomes a factor of prime importance; facts and circumstances known to the arresting officers from which they might draw conclusions warranted by their training and experience become the focus of our attention with due allowance for the discretion vested in the trial court.

Viewed in the light of these announcements, the facts amply establish the reasonable cause to believe, or probable cause for believing, that an offense had been committed and that Millsap was an accomplice in the crime.

The victim's mutilated body was a stark physical reality. Square's implication in the crime was a logical deduction from the use of Roy's name on the check Mrs. Jordan had been forced to write, from the bloody coat found at Square's house, and from the inconsistencies in his story.

A reasonable inference was drawn by the investigating officers that two persons were involved in the crime from the movement of the victim's large body into the car trunk. This inference was reinforced by the report of Dan Slakter that two Negroes tried to cash Mrs. Jordan's personalized check. Another car abandoned in another area of the parish, which had collided with the victim's car, tended to confirm that two persons were involved in the crime. Finally, Officer Davis saw Millsap and Square together early on the morning of the day the crime was committed. This contention that there was no probable cause to make the arrest is without merit.

Millsap's assertion that the waivers were not intelligently made is repudiated by the evidence on the motion to suppress. Testimony was adduced that Millsap, who had been to the eighth grade in school, was intelligent and articulate. The officers who obtained the waivers testified that at the time Millsap stated that he understood what he was doing. Only Millsap's statement on the trial of the motion that he

did not understand the warnings or the waivers stands in support of his position.

With three statements in the record, two of which were recorded, and an admission by Millsap at the trial of the motion to suppress that the Miranda warnings were given and that he signed the waivers, and the other facts mentioned, we cannot uphold the contention that these waivers were not intelligently made.

■ The second bill submitted for consideration involves two motions to quash the indictment alleging that the general venire, from which the petit jurors were to be and from which the grand jury was chosen, was selected in such a manner that various classes of the population were systematically excluded. This action, it is asserted, deprived Millsap of due process of law and equal protection of the laws guaranteed by the Fourteenth Amendment of the United States Constitution and by Federal statutes on the subject. A similar motion was filed after the petit jury was selected.

On the trial of these motions, defense counsel showed that at the time of the murder Millsap, a Negro, was 19 years old and had an eighth grade education. He was a wage earner living in a rented house with an annual income of less than $4,000. He had never served on a jury. Negroes represent one-third of the population in Ouachita Parish.

In contrast, defense counsel established that only ten percent of members of the grand jury which returned the indictment were Negroes. The average age of grand jury members was fifty-one; they had finished 12 years of school and only 31 percent were wage earners. Ninety-two percent of the grand jury were home owners, and all of the jury earned at least $7,000 per annum, fifty percent earning more than $10,000 each year. Almost half of the grand jury had previously served on juries. No females were on the jury.

In Ouachita Parish 65.5 percent of the population are wage earners. The median age in the parish is 25.5, the median education tenth grade and the median annual income $4,367. One-third of the families earn less than $3,000 per year. Only 17 percent of the general venire were members of the Negro race. Some lists used by the jury commission contained no Negroes, the names of some Negroes whose names appeared on the venire were furnished to the jury commissioners by others, and no Negro has ever served on the Jury Commission in Ouachita Parish.

Defense counsel argues that this showing makes out a prima facia case of discrimination and a deprivation of constitutional rights requiring that the indictment be quashed. He relies solely on this contention. In fact, by a stipulation in the record he readily concedes, "there is no allegation or have we intended to introduce any evi-

dence to show that there was any deliberate fraud or deliberate systematic exclusion."

As we understand the main thrust of the defense position, the grand jury which indicted Millsap and the petit jury which tried him does not represent a cross section of Ouachita Parish, a class having the qualifications and characteristics more in keeping with Millsap's own, and the showing made is prima facie evidence of this fact. It is contended that the disparity between Millsap's class and the composition of the venire from which the grand and petit juries were selected is not only based upon race, but also involves social, educational and economic grounds.

The population of Ouachita Parish is 101,000. Each of the five jury commissioners submits lists of names from which individuals are selected to supplement the general venire. These lists are, for example, telephone books, light meter lists, voter registration rolls, union memberships, employee lists of large companies, a Junior Chamber of Commerce membership roster and church memberships. A Negro principal furnishes names, knowledgeable acquaintances of the jury commissioners furnish lists of persons known to them and names are included of persons known to the jury commissioners.

From these lists, names are selected at random, such as every third name, and no effort is made to include or exclude any

particular class. The lists contain names from all walks of life and all geographic areas. The venire is truly composed of a cross section of the eligible population, selected "impartially" in keeping with the mandate of Article 408 of the Code of Criminal Procedure.

When the grand jury or petit jury is not constituted in keeping with the exact percentages which apply parish-wide to race, age, education and economic condition, a conclusion does not result that discrimination has occurred and due process has been denied.

Here, although some disparity existed between the number of Negroes on the jury venire and the percentage of Negroes in the parish as a whole—17 to 33 percent—, the representation of Negroes on the jury venire was substantial. The same can be said of the number of persons in economic, educational and age classes of the jury venire, as compared with those classes in the population as a whole. The disparity, when it exists, is not great and does not deny each class substantial and meaningful representation on the jury venire, nor does the disparity in classes violate the requirement that the jury contain a cross section of the population.

If these standards have been achieved, there can be no prima facie case, and we find none here. Since no attempt was made to show intentional or purposeful discrimination, the jury venire offends no

constitutional requirement. The law does not require mathematical exactitude in proportional representation of classes of the population on jury venires. Hernandez v. Texas, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); State v. Clifton, 247 La. 495, 172 So.2d 657 (1965); and State v. Barksdale, 247 La. 198, 170 So.2d 374 (1965).

The conclusion we have reached is not altered by the claim that no Negro has ever served on the jury commission. Carter v. Jury Com., 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); State v. Marks, 252 La. 277, 211 So.2d 261 (1968); State v. Barksdale, *supra*; Stewart v. State, 237 Ark. 748, 375 S.W.2d 804 (1964), cert. denied, 379 U.S. 935, 85 S.Ct. 336, 13 L.Ed. 2d 345 (1964). And the assertion that no women were listed on the jury venire adds nothing to the claim that a prima facie case of discrimination is established by this record. In this State, "A woman shall not be selected for jury service unless she has previously filed with the clerk of court of the parish in which she resides a written declaration of her desire to be subject to jury service." La.Code Crim.P. art. 402. The defense has not discharged its burden of establishing that women requested jury duty but were discriminated against because of their sex. Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); State v. Alexander, 255 La. 941, 233 So.2d 891 (1970); State v. Pratt, 255

La. 919, 233 So.2d 883 (1970); State v. Comeaux, 252 La. 481, 211 So.2d 620 (1968); State v. Clifton, *supra*.

█ The third and final bill under consideration was reserved when the trial judge overruled defendant's motion for a new trial based on the denial of a motion for a directed verdict. It is contended, moreover, that the trial judge's ruling in the presence of the jury was a comment upon the evidence prohibited by statute. We have been favored with an excellent per curiam of the trial judge (a retired Justice of this Court), and we adopt the per curiam as our reasons for finding this bill to be without merit.

"As this note of evidence clearly indicates, the attorney for defendant, in support of his motion for a directed verdict, relied entirely on the provisions of Articles 778 and 770 of the Code of Criminal Procedure, the provisions of which articles, I submit, do not entitle the defendant to a new trial.

"Immediately after the state rested, attorney for the defendant rose to his feet and in the hearing and presence of the jury, moved for a directed verdict, stating that the evidence was 'insufficient to support a conviction in accordance with Article 778' of the Code of Criminal Procedure. The Court, without any comment, statement or remark, then ruled on the motion thusly: 'Let the motion for a directed verdict be overruled.' At-

torney for the defendant then requested that the jury be removed, which request was granted. He then moved for a mistrial under the provisions of Article 770 of the Code of Criminal Procedure, which motion was overruled.

"Had the defendant's attorney requested the removal of the jury prior to making his motion for a directed verdict, the Court would have granted his request. Such a request had been made in several instances during the progress of the trial and granted each time. On this occasion, however, he elected to make the motion in the presence and hearing of the Jury.

"I submit for the Court's consideration three (3) reasons why the rulings are correct. First, the mere overruling of the motion for a directed verdict, under the fact and circumstances, did not constitute a 'remark' or 'comment' by the Judge on his refusal to direct a verdict of acquittal within the meaning of Article 778, Code of Criminal Procedure. Second, for the Court to remove the jury after the motion had been made in their presence and hearing for the purpose of ruling thereon, would have been a vain and useless thing, because upon continuing with the trial, each and every juror would know, as a school boy would, that the motion for a directed verdict of acquittal made in their presence and hearing, had been overruled.

Third, Article 778 of the Code of Criminal Procedure authorizing the trial judge to order a directed verdict of acquittal in a jury case, is and has been declared unconstitutional. State v. Hudson, 253 La. 992; 21 So.2d 484; decided March, 1969; State v. Roy [Ray] Douglass [Douglas], No. 50162 on the docket of the Supreme Court, decided May 4, 1970 [235 So.2d 563]. See also State v. Broussard (1950), 217 La. 90; 46 So.2d, 48. No citation of authority is necessary for the proposition that an unconstitutional statute is not law and has no effect, the same as not written. This being so, there has never been a valid law in this state permitting a motion for a directed verdict in a case such as this. There being no law authorizing such a motion, the provision of Article 770 on the subject are not to be considered.

"In this bill of exception for the first time, counsel cites and relies on Article 772 of the Code of Criminal Procedure which provides: 'The judge in the presence of the Jury shall not comment on the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved or refuted.'

"The mere overruling of the motion for a directed verdict of acquittal under the facts and circumstances of this case, does not constitute a comment on the

facts within the meaning of the above article. Moreover counsel made the motion in the presence and hearing of the jury and if he thought the ruling would be prejudicial, he should have requested the removal of the jury prior to making the motion. No such request was made. See State v. Weathers, 127 La. 930; 54 So.2d 290 [54 So. 290].

"As stated above, the mere ruling on the motion did not constitute a comment on the facts but even if so under the jurisprudence, remarks made by the trial judge in the jury's presence giving reasons for admitting or excluding evidence, or stating purpose for which evidence is offered or admitted, are not objectionable as expression of an opinion as to the evidence, even though such expressions may pertain to the facts. See State v. Walker, 204 La. 523; 15 So.2d 874; also State v. Scott, 237 La. 71, 110 So.2d 530. I submit that the mere ruling on the motion without any remark or statement was proper, not unfair or prejudicial to the accused. Further, as stated previously, if the Court had ordered the jury removed from the court room after the motion had been made in their presence for the purpose of ruling thereon, and thereafter the case continued, as it was, each and every juror would have known that the motion was overruled.

"With reference to the allegation in the amended motion for a new trial to the effect that the Court failed to charge the jury in its general charge that if it could not reach a unanimous verdict it could report a 'hung verdict' or 'no decision'. No objection to the general charge as given was made. The Court did instruct the jury that all twelve (12) must concur to render any verdict. Further, I know of no law that requires such a charge.

"The amended motion for a new trial also alleges that after the jury had deliberated for six hours, the Court refused defendant's request to instruct the jury that if it could not reach a unanimous verdict, they could report their inability to reach a unanimous verdict. The record does not disclose any such request and in fact no such request was made. The Court was not requested to give any special charges at any time. Further if a request for such a charge had been properly requested it would not have been given for the reason that such a charge would not be proper under the law."

In addition to the Hudson, Douglas and Broussard Cases cited in the foregoing per curiam, we very recently affirmed these decisions in State v. Square, 244 So.2d 200 (La.1971).

For the reasons assigned, the conviction and sentence are affirmed.

BARHAM and TATE, JJ., concur in decree.

DIXON, J., concurs.